## LYON v. FISK et al., Executors.

A testator bequeathed five thousand dollars to one of his clerks, as a gratuity for his faithful services; by a subsequent will he bequeathed to the same person, twenty-five hundred dollars. A few hours before his death, on being asked whether one of the wills should be destroyed, he directed both to be kept. In an action by the legatee to recover both legacies: *Held*, that the declaration of the testator is conclusive against the presumption that the second will was intended to revoke the first; and that, under art. 1686 of the Civil Code, the plaintiff is entitled to recover both legacies.

Where the laws and jurisprudence of a country are reduced into the form of a Code, without any clause of repeal, as was the case with the Code of 1808, the rule of interpretation must be, as in cases of successive statutes, not to favor a repeal by implication, unless in case of manifest repugnance.

Art. 185, tit. 2, book 3, of the Code of 1808, which declares that, "posterior testaments which do not in an express manner revoke the prior ones, annul in the latter only such of the dispositions there contained as are incompatible with the new ones, or contrary to them, or entirely different, must be considered as embodying the provision of law 21, tit. 1, of the sixth Partida, which declares that, where two wills have been made, the legacies in both, either for pious purposes, or to the relations and friends of the testator, shall be valid; and art. 1686 of the present Civil Code, being copied verbatim from art. 185, of tit. 2, book 3 of the Code of 1808, must be considered as having the same meaning as it. The construction of art. 1686, cannot be affected by the repeal of the Spanish laws after the promulgation of the new Code.

APPEAL from the Second District Court of New Orleans, *Canon*, J. The plaintiff sued the executors of *Abijah Fisk*, to recover the sum of $7,500, bequeathed to him by the deceased, $5000 having been left to him by a will dated 27 Nov. 1843, and $2,500 by a subsequent one, executed the 30 April, 1845. The defence was that the first will was revoked by the second.

The first of these testaments contains the following provisions : " I give to the Hon. *Charles Watts* $5,000. I give, devise and bequeath the sum of $5,000 to *Joseph H. Lyon*, at present one of my clerks, as a gratuity for his faithful services. I give, devise and bequeath to the City of New Orleans, my house at the corner of Custom-house and Bourbon streets, on condition that it shall be applied to the keeping of a library for the use and benefit of the citizens of the said city, and to be used for no other purpose. The balance of my estate I give, bequeath and devise to the children of my brother *Alvarez Fisk*, viz : *Stewart Wilkins*, *Alice*, *Edward*, and *Isabel*, to be shared equally, those who are twenty-one years of age to come into possession immediately. Those who are under that age shall have their portion securely placed at interest, or invested in stores producing an income, favorably located in this city, by my executors, until they are twenty one years old, when possession may be given to them. I appoint my nephew *Stewart Wilkins Fisk*, and Hon. *Charles Watts*, as executors of this my last will and testament." This will concludes with a recommendation to his executors to employ *Joseph H. Lyon*, as clerk in settling up his estate, on account of his knowledge of his property and of his debtors, and with a statement that he estimates his estate at $300,000, at least.

The second will is in these words : " In the first place let all my debts be punctually paid, if there are any existing at my death. Secondly, to *Mr. Joseph H. Lyon*, my faithful clerk, I give, devise and bequeath $2,500. Thirdly, to the free schools of the Second Municipality of New Orleans, I give, devise and bequeath $5,000, to be used for the benefit of said school by the aldermen of said Second Municipality. Fourthly, to my brother *Alvarez Fisk*, I give, devise and bequeath the residue of my fortune, both real and personal, for his sole use and benefit. It is with reluctance that I give my brother *Alvarez* so large an amount, who already has so large a fortune for his children. I nominate and appoint my brother *Alvarez Fisk*, and the Hon. *Charles Watts*, as executors of this my last will and testament, requesting them to employ my said clerk, *Joseph H. Lyon*, to aid them in this matter."

The plaintiff introduced witnesses to prove that it was the intention of the testator that the plaintiff should receive both legacies. This evidence was objected to, but admitted by the lower court, subject to exception. *Dr. Meux* testified that, he had been in attendance on the testator for several days, when the latter asked him " how long he thought he would survive. Deponent stated to him not more than two or three hours, upon which deceased ordered his servant to take from his armoire his frock coat, and to hand him a paper that was in said coat; upon which Mr. *Alvarez Fisk* aided in searching for it, and upon getting hold of the paper said : " This is *Abijah Fisk's* will—what shall I do with it ? Shall I destroy it ?" *Abijah Fisk* replied, " No : keep it; the other's in the bank. Keep both." The witness further stated that, he " had heard *Fisk* state that *Lyons* was a very competent clerk, and did the business of two clerks." *Jones*, another witness introduced by the plaintiff stated that, during a spell of sickness under which the testator suffered between July and November, 1843, the latter told him that he had left the plaintiff but $5000, and that he deserved more. *Watts*, one of the executors, was also sworn as a witness for the plaintiff. He testified that, " *Lyon* acted rather as a partner than as a clerk in the management of the business of *Fisk*; that *Lyon* managed his business, both while he was present in New Orleans and during his absence ; that during the last four or five years of his life the testator was in bad health

LYON
*v.*
FISK.

and absent during the summer, and that, during the whole of that time, *Lyon* had the principal management of his business; that a year or two previous to the time when *Lyon* was engaged, the testator had employed a clerk at a salary of $5000, who remained with him only five or six months. Witness understood from the deceased that, the highest salary he had ever given to *Lyon* was $2500 a year.

There was a judgment in favor of the plaintiff for the amount of both legacies, with interest from the date of the demand of payment made of the executors. The latter appealed.

*Elmore* and *W. W. King*, for the plaintiff. Art. 1686 of the Civil Code declares that, "posterior testaments, which do not in an express manner revoke the prior ones, annul in the latter only such of the dispositions there contained as are incompatable with the new ones, or contrary to them, or entirely different." There being no express revocation in the last will, the legacies in both must stand. Nor is there any tacit revocation. The presumption of law is against any such intention on the part of the testator. There is the strongest proof, that he did not intend to revoke the first will by the last. Civil Code, arts. 1705, 1708. Dalloz, on the subject of the revocation of prior wills by subsequent ones, says, vol. 11, p. 174, § 5 : " The contrariety and incompatibility of testamentary dispositions has not been, and cannot be defined by law; it is for the magistrate, to whom it appertains to decide upon them, by a comparison of the expressions in the different wills, and the appreciation of the *peculiar circumstances*, to ascertain the intention of the testator." See, to the same effect, 6 Toullier, No. 318. 30 Merlin's Rép., *verbo* Révocation de Legs, p. 30, Brussels ed. These authorities establish the admissibility of the testimony; being admitted, it proves beyond all doubt, that it was not the intention of the testator to revoke his former will by the last.

Though the evidence of witnesses should be excluded, the plaintiff would be entitled to recover both legacies. The wills bear, on their face, evidence that *it was not the intention of the testator to revoke the first legacy by the last.* The first legacy was a gratuity for the faithful services of the plaintiff, as clerk of the testator. Such a legacy is a remunerative donation. 5 Toullier, no. 186. Pothier, Don. Rémun., nos. 601, 607. In the case of *Fox* v. *Fox*, 2 Rob. 292, it was held, that a legacy, "in consideration of long and faithful services rendered" by the legatee to testator, was a remunerative donation. In the case of the *Succession of Cucullu*, 4 Rob. 398, it was decided, that a legacy, "in recompense of services he *has* rendered me (the testator), and the particular affections I bear him," was, in consequence of the latter clause, a mixed legacy. Had the latter clause been left out, the first would have constituted a remunerative legacy. These authorities show that the legacy to the plaintiff was a remunerative legacy. Such legacies are regarded by the law with peculiar favor. Civil Code, arts. 1500, 1510, 1513. 5 Toullier, 196. This being the character of the legacy to the plaintiff in the first will, no motive could have operated upon the mind of the testator to change it.

The second legacy does not manifest any such desire to change the former legacy.

The continued regard and affection of the testator for the plaintiff, up to the time of his decease, is evidenced by his wills; why then, after several years of additional service, during the testator's protracted illness, should he have desired to diminish the amount willed to the plaintiff, by one-half? The infer-

ence is just the reverse, and this inference is also strengthened by the language with which he concludes his bequest to his brother. He says: "It is with reluctance that I give my brother, *Alvarez*, so large an amount, who already has so large a fortune for his children—inheritance to whom, morality, honesty, education, industry and frugality, is far richer than gold."

We have already quoted art. 1686 of the Civil Code, to the effect that posterior wills revoke only those dispositions in prior wills which are incompatible with, contrary to, or entirely different from, the dispositions of the last will. This principle has been repeatedly acted on by our Supreme Court. See *Sarce et al.* v. *Dunoyer's Executor*, 1I La. 220. *Succession of Bowles*, 3 Rob. 31. *Tournoir* v. *Tournoir*, 12 La. 19. Article 1036 of the Code Napoléon is to the same effect. Dalloz, in the11th vol. of his Jurisprudence of the Nineteenth Century, p. 174, § 6, chap. 9, sect 1, art. 2, says: "We have already said, in chap. 7, § 4, that the willing of one sum of money is not incompatible with, nor contrary to that of the same sum willed, by a prior testament, to the same person. So it was pronounced by the Court of Turin, Feb. 24th, 1807. The same solution should apply in the case where the second testament contains a legacy of a greater or less sum than that contained in the first testament; the legatee can exact both."

Merlin, in his Rép. *verbo* Legs, sec. 4, § 3, no. 22, says: "When a testator wills, many times, the same thing, to the same person, is the same thing due many times? It is necessary to distinguish whether the legacy has for its object a *thing certain* (un corps certain), or a quantity (*une quantité*). A thing certain, though willed many times to the same person, is only due once. * * * When the same quantity is willed many times to the same person, it is necessary to distinguish whether the legacies are contained in the same will, or in different wills. In the firat case, the legacy is due but once, unless the testator has intended to multiply them, which must be proved by the legatee. *In the second case, the presumption is, that the deceased intended to will, many times, the same sum*, but the heir may destroy this presumption, by proof to the contrary." In his additions to the above, volume sixteen, after referring to the Roman law, he continues thus: "That is to say, the heir is not dispensed from paying the sum willed *as many times as there are instruments in writing containing the legacy*, unless he can establish, *not by simple conjectures*, but by *proper evidence*, that the testator intended to make but one legacy." After quoting article 1036, of the C. N., he proceeds to say: "It is evident that if, after having, by a first testament, willed to *Paul* the sum of ten thousand francs, I will him again the same sum, by a second testament, which does not expressly revoke the first, the two wills are not incompatible nor contrary; they should both receive full execution, unless my heir, or universal legatee, has some means of proving that my intention was to make *Paul* but one legacy."

Both of the above authors cite the case of *De la Turbie* v. *Murialdo*. The plaintiff, in that case, recovered three different sums of money, left him in three separate testaments, made at different times.

It was contended, in the lower court, that the legacy to the plaintiff, in the first will, was revoked by the clause in the last will, constituting *Alvarez Fisk* universal or residuary legatee. On this subject, Dalloz says, vol. 11, p. 175, § 9, chap. ix, sec. 1, art. 2: "If, after having made a particular legacy (in a first will), the testator institutes another person universal legatee (in a second will), there is no revocation; for a particular legacy is far removed from being

incompatible with an universal legacy; the law charges the universal legatee with the payment of particular legacies." He refers to many authorities. See also Merlin, Rép. *verbo* Révocat. de Legs, § 2, Additions. 31 Sirey, 2d part, 306. 33 Sirey, 2d part, 494. *Sarce et al.* v. *Dunoyer's Executor*, 11 La. 223. *Tournoir* v. *Tournoir*, 12 La. 19.

The opposing counsel rely upon the case of *Compton* v. *Prescott's Executor et al.*, 12 Rob. 65, to show that a residuary legatee is not an universal legatee. The authority of this case is directly against the defendants, in their endeavor to establish a distinction between a residuary and an universal legatee, in a case like the one before the court. But, if it did establish the principle contended for, it is difficult to concede how a residuary legacy should have a greater effect in annulling a prior special legacy, than an universal legacy—how the willing of a portion should have greater effect than the willing of the whole to the same person. Dalloz declares, vol. 11, p. 175, sec. 10, that, "a particular legacy, whether made before or after a general legacy to a different person, is not revoked by it." He refers to various authorities. He says further, in sec. 11, that there is no identity between sums of money willed successively, to many persons, by different testaments. See also Merlin, Rép. *verbo* Révocat. de Legs, no. 22. The counsel for the defendants attempted, in the lower court, to draw a distinction between art. 1686 of our Code and art. 1036 of the Code Napoléon. The distinction between the two Codes is fanciful; it is a distinction without a difference.

In discussing the subject of the revocation of legacies, we have made no use of Duranton or Toullier. The doctrines of Duranton have been condemned both by the courts of France and of our own country. See *Sarce et al.* v. *Dunoyer's Executor*, 11½ La. 293. Those of Toullier have been commented upon and severely condemned by Merlin and Dalloz. Merlin, Rép. *verbo* Révocat. de Legs, § 2, add. 1, no. 22, reviews with great severity no. 643 of 5th Toullier. The latter author constantly confounds the Roman law with the present French law. No two systems can be more diametrically opposed. Dalloz, vol. 11, chap. 9, séc. 1, art. 2, p. 173, § 2, says that "the Roman law did not admit of the simultaneous existence of two testaments : a testament was destroyed by the making of a posterior testament." "But now," he adds, "under art. 1036 of the Code Napoléon, the law is different—posterior testaments, which do not expressly revoke preceding ones, revoke, in the former, only those dispositions contained in them which are incompatible with, or contrary to, the last." Such is also the law of Louisiana.

We have thus shown that the legacy to the plaintiff in the first will was not revoked by the second : 1st. By parol testimony, which proves clearly that such was not the intention of the testator : 2d. By the intrinsic evidence of the wills themselves : 3d. By legal authorities, which establish that, a particular legacy in a subsequent will does not revoke a particular legacy to the same person in a prior will : 4th. That constituting an universal legatee, by a subsequent will, does not revoke a particular legacy in a former will.. In conclusion, we would call the attention of the court to art. 1706 of the Civil Code, which prescribes that, in cases of doubt, such a [construction is to be given to testaments as to give effect to all of their dispositions, rather than one in which they can have no effect.

*Prentiss* and *Finney*, for the appellants. The last will operates a tacit revocation of the first; and the legacy in the second will is a substitute for the le-

gacy in the first. By the Roman law a posterior testament always annulled.a prior one, without any express revocation. Our Code has changed the Roman law, and provides, in art. 1686, that "posterior testaments, which do not in an express manner revoke the prior ones, annul in the latter only such of the dispositions there contained as are incompatible with the new ones, or contrary to them, or *entirely different.*" It follows then, that all dispositions in the first will, "incompatible with," "contrary to," or "entirely different from," those contained in the second, are revoked. Let us test by this article the case before the court. *Abijah Fisk's* last will contains a complete disposition of his whole estate, moveable and immovable : 1st. It directs payment of all testator's debts : 2d. Bequeaths to plaintiff a legacy of $2,500 : 3d. Bequeaths to the free schools, &c. 5,000 : 4th. Bequeaths " the residue" of testator's fortune, both real and personal, to his brother, *Alvarez.* The word "residue" here evidently has reference to the three preceding clauses of the same instrument. It is the complement of those clauses, and was manifestly intended to make up, in connexion with them, a disposition of all the testator's property. It cannot be construed as referring to the first will, and meaning only " the residue" after satisfaction of the dispositions of that will ; because that disposes also of the whole estate, and if its dispositions are first satisfied, there will be nothing left upon which the second will can operate, and of course no " residue" at all. Is then the second will "incompatible with," " contrary to," or " entirely different from" the first ? The ready answer is, the whole of the testator's property is disposed of in the last will, and its disposition is " *entirely different*" from that contained in the first. The plaintiff is entitled, under the second will, to a legacy of $2,500 ; all the rest of the estate is disposed of to persons *not named* in the first will.

We admit plaintiff's right to $2,500, but he demands in addition, $5,000, under the first will. To this we answer, there is nothing out of which to pay this legacy ; *the estate is otherwise disposed of* by a posterior testament ; and that, too, by dispositions in the language of the Code, art. 1686, " entirely different" from those in the prior will by which plaintiff claims. It will not be denied that, if this $5,000 had not have been bequeathed in the first will, it would go to *Alvarez Fisk* under the second. Is not then, the disposition of the second will in this respect, " entirely different" from that of the first ? In other words, is not a bequest of $5,000 to *Alvarez Fisk,* " entirely different" from a legacy of the same money to *Joseph H. Lyon ?* But plaintiff relies upon certain French authorities in relation to the construction of article 1036 of the Code Napoléon, and also upon a decision of the Supreme Court of this State, in the case of *Sarce et al.* vs. *Dunoyer's Executor,* 11 La. 220. The old French law followed the Roman ; and posterior testaments always annulled and revoked prior ones. Domat, 2d part, book 3d, tit. 1, sec. 5, arts. 1 and 2. Under the Code Napoléon, a new construction arose. Art. 1036 of that Code enacted that posterior wills revoked the dispositions of prior ones, only so far as the former were contrary to or incompatible with the latter. A majority of the French commentators have decided, under this article, that *an universal legacy* in a posterior will does not revoke or annul particular legacies, nor even legacies under an universal title, contained in a prior one. This is undoubtedly now the doctrine of the French courts, although Duranton and others oppose it, and hold to the old Roman rule. The authorities may be found referred to in Dalloz, Dic. de Jurisp., Révocation des Testamens, art. 2, s. 2, nos. 73, 74,

LYON
v.
FISK.

75. The decision of the Supreme Court in *Sarce et al.* v. *Dunoyer's Executor*, was made wholly upon the faith of the French authorities, and under the erroneous impression, expressed in their opinion, that the corresponding article of our Code, 1686, was entirely similar to the article 1036 of the Code Napoléon. Such, however, is not the case. The French article does not allow a posterior will to revoke the dispositions of a prior one, except where it is contrary to or incompatible with such dispositions, &c. The framers of our Code have copied the French article *verbatim ;* ·but they have not merely copied it, they have added to it the words, " or entirely different." Now, a judicial tribunal will always seek some meaning in the language of the law-maker. If the construction of a law has been well settled by judicial decisions, and the legislator or law-giver, in re-enacting it, adds to it another provision, it is to be presumed that such new provision is intended to limit, modify or extend, in some way, the effect of the previous law. The court is bound to seek a meaning, rather than leave the new clause barren. It would not be decorous to suppose the law-maker would do so vain a thing as to attach a new provision to an old and well settled law, without any intention of changing its operation and effect. Our law-makers, taking the Code Napoléon for the basis, constructed our own system. They adopted art. 1036, and added the words "or entirely different." What did they mean by this new phrase ? We think it is evident they intended to *enlarge* the revocatory power and effect of posterior testaments. By the old civil law posterior testaments always revoked prior ones, whether their dispositions were incompatible or not. By art. 1036 of the French Code, posterior testaments revoke prior ones, only so far as they are incompatible with, or contrary to them. Now the framers of our Code either intended by the additional clause, to extend the revocatory power of posterior testaments, and go back a step nearer to the Roman law, or they meant nothing. They retained all the revocatory provisions of the French article, and added a new one embracing an extensive class of cases, to wit, all those dispositions of posterior wills " entirely different" from the dispositions of prior ones. This new phrase was intended to embrace other dispositions than those "incompatible with or contrary to" each other, or it is mere tautology. Many subtle distinctions had arisen under the French article. Dispositions " entirely different" had been adjudged to be neither incompatible with, nor contrary to each other. We may reasonably suppose our law-makers intended to avoid these subtilties, and we invoke the provision they have inserted for that purpose. We say that *Abijah Fisk*, by his last will, disposed of his whole estate (with the exception of $2,500), in a manner "entirely different" from the dispositions of his first will ; and that consequently, under our Code, the last testament revokes all such dispositions, even though they should be held valid under the French law.

But we contend that the second will is a total revocation of the first, even under the principles of the French law, and in full accordance with the doctrine laid down by the Supreme Court, in *Sarce et al.* v. *Dunoyer's Executor.* The utmost extent to which the authorities cited on the other side go, is, that an *universal legacy* in a posterior will does not revoke or annul particular legacies in a prior will. The ground taken is that such universal legacy is not contrary to or incompatible with particular legacies ; that the universal legatee takes the whole, or *universalité* of the estate, subject to all charges of debts and legacies, even legacies under a universal title ; that the universal legatee stands as the instituted heir, and is bound to fulfil the wishes of the testator ; and that it is *of his*

*very quality*, that he shall pay all legacies and charges. We admit, therefore, that if *Alvarez Fisk* is the *universal legatee*, his institution as such in the second will, does not, according to the French authorities upon the Code Napoléon, revoke or annul the legacies in the first will, whether they be particular or under universal title. Whether the addition to the language of the corresponding article of our own Code, authorises a different construction here, has been already argued. But we will now attempt to show that the residuary legatee in this case is not a *universal legatee*, nor even a legatee by an universal title, but simply *a particular legatee*, and no more bound to pay the legacies of the first will than the plaintiff himself. Our Code, art. 1599, defines an "universal legacy" to be "a testamentary disposition, by which the testator gives to one or several persons, the whole of the property which he leaves at his decease." The same definition, is given in substance in the corresponding article of the Code Napoléon. The universal legatee (when there are no forced heirs) is seized of right, by the decease of the testator, of the effects of the succession. C. C. 1602. He is bound to discharge all the legacies, &c. C. C. 1603. It is also a well settled principle of the French law that an universal legatee has the right of accretion.

Now let us test by these rules, whether the residuary legacy to *Alvarez Fisk*, be an universal legacy or not. The testator, after directing the payment of his debts, makes three bequests: 1st. $2,500 to plaintiff as "his faithful clerk." 2d. $5,000 to "the Free Schools," &c. 3d. "The residue of his fortune, both real and personal," to his brother *Alvarez*. This last, or residuary legacy, is clearly not an *universal legacy*: 1st. Because it is not a testamentary disposition of the "*universalité*" of the goods of the testator, but only of what shall remain after the payment of the *two particular legacies* of $2,500, and $5,000; in other words, of a part of his goods, only. 2d. *Alvarez Fisk*, as residuary legatee, *was not seized*, upon the death of the testator, of all the goods of the succession, but they went to the testamentary executors. This, the plaintiff himself acknowledges by claiming his legacy of the executors, and not of *Alvarez Fisk*, as universal legatee. 3d. The residuary legatee, in this case, is not bound to pay the previous legacies; he has nothing to do with them; they must be demanded of the executors, and the residuary legatee himself must claim his legacy in the same manner.

Suppose no executors had been named, or those named had refused to accept, would the residuary legatee have been seized of the whole of the goods of the succession, and entitled to the possession? Clearly not; it would have been necessary for the court to have appointed a dative testamentary executor, whose duty it would have been to pay the debts and legacies. But such a necessity could not exist if the residuary legatee was also universal legatee; for in such case, as we have already shown he would have been, upon the death of the testator, seized of all the goods, and charged with all the debts and legacies.

This matter is not open for argument. It has already been settled by this court. In the case of *Compton et al.* v. *Prescott et al.* 12 Rob. 56, this very question arose, and the capacity of the plaintiffs to sue turned entirely upon it. The court, in that case, decided directly and expressly, that *residuary legatees* were not *universal legatees*, and, consequently, not entitled to the right of accretion; but that all lapsed legacies went to the heirs at law. This is conclusive of the present case, for if the residuary legatee in the last will, is not a

universal legatee, then he cannot be held bound to discharge the legacies of the first will. He takes the "residue" after fulfilling the dispositions of the last will, wholly unincumbered by the disposition of the first; the bequest of that "residue" is a disposition of it "contrary to, incompatible with, and entirely different" from, the dispositions of the first will; therefore, according to art. 1686 of our Code, it revokes and annuls such previous dispositions.

Here we beg to call the particular attention of the court to arts. 1699, 1700, 1701 and 1702 of the Civil Code. Art. 1699 *abolishes the right of accretion,* except in case of a legacy made to several conjointly, &c. Art. 1702 provides that, "except in the cases prescribed by the two preceding articles, every portion of the succession remaining undisposed of, either because the testator has not bequeathed either to a legatee or to an instituted heir, *or because the heir or the legatee has not been able, or has not been willing to accept it, shall devolve upon the legitimate heirs.* These articles fully maintain the decision in the case of *Compton's Heirs* v. *Prescott et al.,* without resorting to the reasoning of the court. Nothing can be clearer than that, under our Code, (whatever it may be under the French,) lapsed legacies do not go to the residuary legatee; but, by virtue of art. 1702, devolve *upon the legitimate heirs.* The residuary legatee then, under our Code, wants one of the essential qualities of a universal legatee under the old civil law, to wit: that of "accretion of lapsed legacies."

Had the two legacies in the last will lapsed, by inability or unwillingness of the legatees to take, what would have become of them? They would have been a portion of the succession "remaining undisposed of," "because the legatee had not been able, or had not been willing to accept it, and would accordingly have devolved upon the legitimate heirs." The residuary legatee, then, under our Code, is clearly not an universal legatee in the sense of French commentators, for he has not the "right of accretion," which right is, in the view of those authors, of the very essence of an universal legacy, and a correlative of the liability of the liability of the universal legatee to pay the particular legacies of a prior will.

.. Again, the fact that art. 1702 has abolished the right of accretion goes far to sustain our view of the construction of art. 1686, and to show that our lawmakers intended to make, in regard to this subject, a radical change of the French Code. But there is still another view of this case which will show that, it would be destructive to the intentions of the testator to construe the residuary legacy in this case, as a universal legacy; for, if the residuary legacy in the second will be decided to be an "universal legacy," then the court *must also decide* that, the residuary legacy to the children of *Alvarez Fisk,* in the first will, is *equally an universal legacy.* Now the French authorities, on which the plaintiff relies, all concur in the opinion that a universal legacy in a *posterior will* does not revoke or annul an universal legacy in a prior one; but that the two universal legatees *concur,* and take the estate between them. 5 Touillier, no. 646, &c. By such a construction then the children of *Alvarez Fisk* would concur with him and be entitled to one half of the estate, would clearly be in utter violation of the intentions of the testator.

We might rest here; but we will go a step farther, and show that the *residuary legacy* in this case is not even a legacy under a *universal title,* but is a legacy *under a particular title,* and consequently subject only to the rules applicable to to that title. It is true, in the case cited from 12 Robinson, the court, in deciding that the residuary legatees were not universal legatees, calls them lega-

LYON
v.
FISK.

tees under an universal title. In this we think the court erred. The question whether they were legatees under an universal or particular title, was of no importance in the cause, and the point was probably not considered. The legacy under an universal title is defined by art. 1604 of the Civil Code, to be "that by which a testator bequeaths a certain proportion of the effects which the law permits him to dispose of, as one half, a third, or all his immovables, or all his moveables, or a fixed proportion of all his immovables, or all his moveables." Now, under this definition, a residuary legacy may, or may not be a legacy under an universal title, according to the nature of the previous bequests. For example : if a testator bequeaths one-fourth of his goods to A, one-fourth to B, and the "residue" to C, the residuary legacy is one under an universal title ; because it is a certain proportion of his effects, to wit, one half. If, however, he bequeaths a house to A, a certain sum of money to B, and the "residue" of his goods to C, this disposition clearly does not come within the definition just quoted of " a legacy under an universal title, for this residuary legacy is not of any " certain proportion," or aliquot part of his effects, nor of any " fixed proportion" of all his immovables, or all his moveables."

There is another test. A legatee under an universal title must always share something with the other legatees. He has a " certain proportion." But in this case there are two legacies to be first paid ; one of $2,500, the other of $5,000. Now if the estate should only amount to $7,500, the residuary legatee would get nothing. He has, therefore, no *certain or fixed proportion* of the effects ; and consequently his legacy cannot be called a legacy under an universal title. Art. 1618 of the Civil Code provides that " every legacy not included in the definition before given of universal legacies and legacies under an universal title, is a *legacy under a particular title.*" The residuary legacy then to *Alvarez Fisk* is a legacy *under a particular title*, and under art. 1598 of the Code, has effect according to the rules established for particular legacies. If this reasoning be true, then the will of *Abijah Fisk* disposes of his whole estate by legacies under *particular title*, which disposition is " contrary to, incompatible with, and entirely different" from, the dispositions of the first will.

It will hardly be urged that a legatee under a particular title, in a posterior will, is bound to pay all the particular legacies of a prior will.

The case, then, stands thus : The testator, after payment of his debts, has bequeathed to *Alvarez Fisk*, under particular title, all his " fortune, both real and personal," except $7,500. By a previous will, he had made an "entirely different disposition" of his effects. Which disposition shall stand ?

Not an authority has been, or can be cited, which will sustain the dispositions of the first will against those of the second, upon any other ground than that the second contains an universal legacy, and that an universal legacy, in a posterior will is not incompatible with particular legacies in a prior one, and does not, therefore, revoke them. This was the only ground of the decision in the case of *Sarce* v. *Dunoyer*, and constitutes the basis of all the French authorities. But in this case we have shown that there is no universal legatee in the last will, and consequently that none of the authorities cited by plaintiff are applicable to the case. We come to the conclusion, then, in regard to this point, that the last will of *Abijah Fisk*, being a complete disposition of all his estate, revoked and annulled, *in toto*, his prior will, under which plaintiff claims.

We will now briefly consider the last point, to wit : Is the bequest to plaintiff of $2,500, in the last will, a substitution for the legacy of $5,000 in the first, or

are the two cumulative ?  We admit the general rule to be (though with much opposition of authority,) that legacies to the same person by different instruments, are, *prima facie*, cumulative ; but we contend that there are exceptions to this rule, and that the rule itself gives way to the intention of the testator, if it can be fairly gathered from the provisions of the instrument.  The exception is, that when a second legacy is given *for the same cause*, it is not to be considered a double legacy, but a substitution.  This is directly decided by Lord Hardwicke, in the case of the *Duke of St. Albans* v. *Miss Caroline Beauclerc et al.*, 2 Atkyns, 640    The decision is based entirely upon the civil law.  That great judge, after laying down various rules of construction, says :  " The commentators on the civil law agree that, when another legacy is given *for the same cause* in different instruments, there shall not be a double legacy."  Now, in this case, the testator gives the first legacy to plaintiff " as a gratuity for his faithful services ;" he bequeaths the second to him as his " faithful clerk."  The *cause*, or consideration, of the second legacy is clearly the same as that of the first.  In each one the legacy is intended as a mark of the testator's regard for the faithful services of his clerk, and, under the rule laid down by Lord Hardwicke, cannot be construed as a double legacy.

But the instruments show upon their face, that the second legacy was intended as a substitution.  In the second will he makes a disposition of his whole estate entirely different from the first.  By disposing of all his goods in in the second will, he indicates his intention to annul the first.  It is manifest he inserted in the second the dispositions of the first which he desired to retain.  In the first will he bequeathed to the Hon. *Charles Watts* $5,000, and constituted him one of his executors.  In the second will he again constitutes him executor, but omits the legacy.  If he thought it necessary to re-institute him executor, he must have supposed it equally necessary to reiterate his legacy of $5,000, if he intended him to take it.  By not doing so, he has clearly indicated his intention that this legacy of $5,000 should not stand.  Again, in the first will, he bequeaths a house and lot to the city of New Orleans, for the uses of learning.  In the second will he omits this bequest, but gives $5,000 to the free schools.  It can hardly be doubted that in making the last bequest, he intended it as a *substitution* for the first.  In the first will he bequeaths $5,000 to plaintiff, for his " faithful services."  In the last one, he does not notice or refer to this bequest, but bequeaths him $2,500, as his " faithful clerk."  It cannot be doubted that the last legacy was intended in lieu of, and as a substitution for the first.  It is clear that the testator intended in his last will to contract his previous liberality towards strangers.  He omits entirely the legacy to Judge *Watts*, though he still retains confidence enough in him to constitute him again his executor.  He changes his donation to the public of a house and lot of great value, to a moderate bequest of $5,000 ; and reduces the legacy to his clerk, the plaintiff, from $5,000 to $2,500.

Should any doubt exist as to the testator's intention, we invoke in our favor art. 1710, C. C., which provides, " that where there is doubt, the legatee takes only the smaller quantity."  In this connexion we also cite the case of *Robonam's heirs* v. *Robonam's executors*.   12 La. 73.   1 Toul. nos. 641, 643.

Some parol evidence was taken at the trial, but it is hardly worthy of notice.  Dr. *Meux* testified to some expressions of the testator, while *in extremis*, indicating a wish that both wills should stand.  These expressions were too vague and uncertain to be entitled to any weight, even if important.  But they are of

no importance. The two wills cannot both stand, because their dispositions are entirely different. The wish of the testator to that effect, however solemnly made, could avail nothing, unless clothed with the solemnities of a testament.

The testimony, besides, was clearly illegal, and was excepted to below, and the exception is insisted on here. 2 Atkyns, R. 372. 1 Greenleaf's Ev. 382. 11 John. R. 212. 2 Roberts on Wills, 10–27. The evidence of *Jones*, as to the testator's intention to make a large provision for plaintiff, is equally irrelevant and pointless. It need only be noted, that the conversation between witness and testator took place *before* either of the present wills were made; so that whatever were originally the intentions of testator, he certainly abandoned them.

*Benjamin* and *Micou*, on the same side.

The judgment of the court was pronounced by

Rost, J. On the 27th of November, 1843, *Abijah Fisk* made an olographic will containing the following legacy: "I give, devise, and bequeath the sum of $5000 to *Joseph H. Lyon*, at present one of my clerks, as a gratuity for his faithful services." On the 13th of April, 1845, this testator made a second will, in which he leaves the plaintiff another legacy, couched in these words: "In the first place, let all my debts be punctually paid, if there are any existing at my death. Secondly, to Mr. *Joseph H. Lyon*, my faithful clerk, I give, devise and bequeath $2500." Two or three hours before his death, the testator being in the full possession of his mental faculties, and remarkably collected, ordered his servant to hand him a paper that was in his coat-pocket, upon which *Alvarez Fisk*, his brother and residuary legatee, aided in searching for it, and, upon getting hold of the paper, he said: This is *Abijah Fisk's* will; what shall I do with it? shall I destroy it? The testator replied: "*No, keep it; the other is in the bank; keep both.*" Both were accordingly kept, and duly probated after the death of the testator. The plaintiff now seeks to recover the amount of the two legacies, and his claim is resisted by one of the executors, upon the ground that the legacy in the last will was a revocation of the legacy contained in the first. Judgment was rendered in his favor in the court below, and the defendants appealed.

Article 1686 of the Civil Code, under which the only question presented by this controversy is to be determined, is in these words: "Posterior testaments, which do not in an express manner revoke the prior ones, annul in the latter only such of the dispositions there contained as are incompatible with the new ones, or contrary to them, or entirely different."

A vast number of authorities, taken from the commentators on the Roman and French laws, and from the decisions of the English courts, have been adduced on both sides, in support of the opposite interpretations put upon that article by the counsel. Analogies and distinctions drawn from those sources, would be entitled to much weight, if our own positive legislation had not, so far as it bears upon this controversy, placed the meaning of that article beyond all reasonable doubt. It is true that in Rome, and in France before the adoption of the Napoléon Code, the rule on this subject was, "*Per secumdum testamentum infirmatur primum.*" It is now universally admitted that, the law should establish no presumptions but such as are certain and infallible; and that the presumption of the Roman law that, second wills are intended to revoke the first, was often contrary to truth; and, while on this subject, it may be observed that no case can be imagined, in which that presumption would do greater violence to truth than in the present. The last words of the testator—*do not*

Lyon
*v.*
Fisk.

*destroy that will; keep them both*—leave nothing for that presumption to rest upon; and, under art. 1708 of the Civil Code, that circumstance is the best possible evidence of his intention.

But the ascertainment of the intention of the testator, is not necessary to the decision of this case. The law 21st, tit. 1st, Partida 6th, expressly provided that, where two wills had been made, the legacies contained in both, either for pious purposes, or given to the relations or friends of the deceased, *should remain valid.* It was a vexed question among commentators, whether, under an exception to the general rule, similar legacies were both valid under the Roman law. Under the Spanish law, says Gregorio Lopez, there can be no doubt of their validity. Tene ergo menti istam legem Partitarum expressé decidentem, legata primi testamenti deberi. Gregorio Lopez, on the law already cited. Such was the rule when, in 1808, the civil laws of Louisiana were revised and embodied in the old Code. In that Code is found, on the subject of the revocation of wills, the article which has since been transferred into the Louisiana Code, under number 1686. As was observed in relation to article 2412 in the case of the *Bank of Louisiana* v. *Farrar, ante* p. 49, that article contains no clause of repeal, and does not purport to make any change in the legislation of the country. It must therefore be considered as the embodiment of the laws and jurisprudence in *pari materia*, existing at the time.

Where the revision and formation into a Code of the laws and jurisprudence of a country is effected without a clause of repeal, as was the case with the Code of 1808, we hold the rule of interpretation to be, as in cases of successive statutes, that the law does not favor a repeal by implication, unless the repugnance be quite plain; that the Code must be confined to repealing as little as possible of the preceding laws; that although a disposition of the Code may seem repugnant to some of those laws, that disposition must, if possible, have such construction, that it may not be a repeal of those laws by implication. We hold that the same rule is to govern, where different powers given by the former laws and by the Code may well subsist together. Dwarris on Statutes, 4th Law Lib. p. 31.

The disposition of the Spanish law, giving to testators the power to make bequests to their friends by two different wills, may well subsist with the powers given to testators by the Code, and must therefore be viewed as explanatory of its meaning and intent. Such was the contemporaneous interpretation of those dispositions of law.

In the year 1819, two learned jurisconsults were appointed by law to translate into English that portion of the laws of the Partidas, which was considered as still in force. They inform us in their preface, that they translate no other; and the law 21st, of the tit. 1st, of the 6th Partida, already adverted to, is found entire in their translation, 2 Moreau & Carleton's Part. p. 969. That law and art. 1686 were both in force, from 1808 until the promulgation of the new Code. The disposition of the Spanish law was then repealed; but that repeal could not, and did not affect the legal intendment of the article of the Code. If, notwithstanding that article, the two legacies would have been valid before the repeal took place, the testator in making them now has not violated the law, and it is the duty of his executors to pay them both.

*Judgment affirmed.*