(41 South. 913.)

No. 16,011.

DOULLUT v. SMITH et al.

In re SMITH et al.

(June 4, 1906.   Rehearing Denied June 30, 1906.)

1. APPEAL—JURISDICTIONAL AMOUNT.

The appellate court properly determines the question of its jurisdiction, quoad the amount in dispute, from the facts disclosed by the transcript in the particular case under consideration.

[Ed. Note.—For cases in point, see vol. 2, Cent. Dig. Appeal and Error, § 99.]

2. SAME—REVIEW.

Where an exception of no cause of action is tried with the merits in the district court, without objection on the part of the defendant, who obtains judgment on the merits, and prays for no amendment on the appeal, the appellate court properly hears the case, as it was heard in the district court, on the merits.

3. TAXATION—TAX DEED—QUIETING TITLE—DEFENSES.

Where, in a suit to obtain possession under a title derived from a tax sale and for the quieting of such title, the defendant alleges the nullity of the sale by reason of the prior payment of the tax for which it was made, and also alleges that the vendor, under whom the plaintiff claims, in acquiring his alleged title, intended to redeem the property for his (defendant's) account, there is no such inconsistency of allegation as to estop the defendant from proving the nullity of the tax sale.

Provosty, J., dissenting.

(Syllabus by the Court.)

Certiorari to Court of Appeal, Parish of Orleans.

Action by Milton P. Doullut against Louisa Smith and others. Judgment for defendants was reversed by the Court of Appeal, and they apply for certiorari or writ of review. Reversed and judgment of the district court affirmed.

A. E. & O. S. Livaudais, for applicants. James Wilkinson and John Dymond, Jr., for respondent.

## Statement of the Case.

MONROE, J. Plaintiff, claiming (through Haspel & Davis, who acquired from H. C. Huntington, adjudicatee) under a tax title resulting from a sale made June 15, 1895, for the taxes of 1893 and 1894, brings this suit against the defendants, as the former owners of the property sold, alleging that the period of redemption has expired, that "the property has never been redeemed, * * * that it is more than three years since the registration of said tax deed, and that petitioner, under the section 65 of Act No. 85, p. 134, of 1888, is entitled to a writ of seizure and possession * * * commanding the sheriff * * * to place him in full possession of said property, * * * and under the provisions of section 3 of Act No. 101, p. 128, of 1898, carrying into effect article 233 of the Constitution of 1898, is entitled to have his title to the property quieted by means of the proceedings therein provided, and praying for the necessary order and judgment in the premises, and,. agreeably to the prayer of his petition, a writ of possession issued, which was duly executed on March 14, 1905, by the eviction of the defendants and the putting in possession of the plaintiff." In the meanwhile, that is to say, between the dates of the filing of the petition and the execution of the writ, the defendants (the widow and heirs of James Smith) filed an exception of no cause of action, which was subsequently referred to the merits, whereupon, reserving the benefit of their exception, they answered, setting up title to the property claimed, alleging that they had been in uninterrupted possession, as owners, from the date of the death of their author until evicted by the writ herein issued, and that the sale of said property for the tax of 1894 was null for insufficient advertisement, and for the tax of 1893 because the same had been paid; that the alleged transfer of the property from Huntington to Haspel & Davis was void because not conforming, in several particulars, to the law regulating the transfer of real estate; and further alleging that the amount paid for the property, by Huntington, was ad-

vanced by Haspel & Davis for account of Antoine Jones, undertutor of the minor children of James Smith, who intended to redeem the property, "the said Haspel & Davis purchasing as agent, and for the benefit of said minors and your other respondents, and that the said amount has been refunded to said Haspel and Davis by your respondents"; and they pray that the title set up by plaintiff be decreed null, and that they be recognized as the owners of the property and replaced in possession. Thereafter the plaintiff filed a supplemental petition, asking to be allowed to call Haspel & Davis and H. C. Huntington in warranty, to which defendants excepted, that a call in warranty could not be made by the plaintiff, and that the petition disclosed no cause of action. This was followed by the filing, on behalf of Haspel & Davis, of a petition of intervention (in which interveners join plaintiff in his demand and set up a variety of defenses against the reconventional demand of the defendants), and by an answer on behalf of Huntington (to the call in warranty), in which the appearer admits the sale of his right, title, and interest in and to the land in question to Haspel & Davis, but denies the warranty. It was then agreed that the exceptions, as filed, should stand as exceptions to the intervention as well as to the supplemental petition of the plaintiff, and thereafter they were overruled. Defendant then filed an answer to the intervention, and the case was tried on its merits, with the result that there was judgment for plaintiff in which the original exception of no cause of action was specifically overruled. The then judge of the district court was, however, made a member of the Court of Appeal before the judgment so rendered became final, and his successor in the district court granted a new trial, and, after hearing on the merits, gave judgment for the defendants, decreeing them to be the owners of the property in dispute, and ordering that the inscriptions of the titles relied on by the plaintiff and interveners be canceled; which judgment, upon the original hearing, was affirmed, but, on rehearing, was reversed, by the Court of Appeal.

## Opinion.

The defendants allege in the petition for review which has been presented to this court that the ruling last mentioned is erroneous in certain particulars which will be considered, seriatim, to wit:

1. In overruling defendants' motion to dismiss the appeal, which was based on the allegation that the amount or value in controversy exceeded $2,000, defendants seemed to rely, in support of this motion, upon the fact that in two suits (Bayou Cook Navigation Co. v. Doullut et al., 111 La. 517, 35 South. 729, and Louisiana Navigation & Fisheries Co. v. Doullut et al., 114 La. 906, 38 South. 613), brought by corporations, or supposed corporations, of which plaintiff was president, for the expropriation of the property here in question, appeals were taken to and entertained by this court. The question of jurisdiction does not, however, appear to have been raised, or to have attracted attention in either of those cases. In any event, from the evidence in the record which has been brought up from the Court of Appeal, it appears that the property in question is worth less than $2,000, and that court correctly held that the question of jurisdiction was to be determined from that evidence.

2. In declining, for the reason that the defendants had not joined in the appeal or asked for any amendment of the judgment, to consider their exception of no cause of action, which, as they allege, over their objection, the trial judge had referred to the merits, and did not thereafter rule on. We find from the record that on the first trial in the district court the exception was referred to and decided with the merits, and we do not find that on the second trial defendants

made any request that it should be tried separately. As the case was presented to the Court of Appeal, therefore, the rights of the defendants in that respect appeared to have been waived, and the Court of Appeal properly considered the case, as the district court had done, upon its merits.

3. In holding that defendants, whose main contention and plea was that of the nullity of a tax sale, on the ground of payment of the tax prior to the sale, were estopped by subsequent allegations in their answer, alleging other and further grounds of nullity in said sale, to prove that said tax had been paid.

Upon this subject, the Court of Appeal says:

"Further consideration of the issues involved, and of the authorities cited, have persuaded us that we erred in holding that defendants were not estopped by the pleadings from making proof that the taxes on the property sued for, for the year 1893, had been paid previous to the tax sale, and that the estoppel could not be urged by way of objection to the proffered evidence. * * * The answer, after averring that the tax sale was null because the taxes of 1893 were paid, and that therefore no title was conferred on Huntington, the tax purchaser, adds, 'Respondents further aver that the amount advanced by the firm of Haspel & Davis [who acquired the property from Huntington]' and paid over to Henry C. Huntington, being the amount by him paid at tax sale for the property and penalties and costs added, was, at the time, intended as a redemption of the property by Haspel & Davis for the account of one Antoine Jones, the undertutor of the minor children of James Smith, who intended to redeem the same, the said Haspel & Davis purchasing as agent, and for the benefit of the said minors and your other respondents, and that the said amount has been refunded to the said Haspel & Davis by your respondents.

"Here is a distinct ayerment that the purchase by Haspel & Davis from Huntington was nothing more nor less than a redemption of the property, sold for taxes, by Haspel & Davis for, and on behalf of, and for the benefit of, defendants, and that the amount so paid by Haspel & Davis was repaid by defendants.

"The validity of the tax sale being thus judicially admitted by the averments of the answer, all evidence offered for the purpose of showing its invalidity was properly objected to, hence the ruling of the lower judge [duly excepted to and bill reserved] was error. Disregarding, therefore, any evidence which may be in the record as to the payment prior to the tax sale of the taxes of 1893, there is left nothing in defendants' case for consideration, except their averment that Haspel & Davis redeemed for them, and that they refunded the amount so paid. A careful survey of the evidence satisfies us that no such fact has been established. Indeed, this branch of the case seems not to be seriously pressed. At any rate, it is without any proof to sustain it."

And there was judgment for plaintiff.

It will, perhaps, conduce to a better understanding of the case to state the facts in connection with which these deductions and rulings have been applied.

By the death of James Smith, in 1877, the title to the property in controversy (consisting of a tract of land measuring one arpent front on the Mississippi river by forty arpents in depth) vested in Louisa Smith, his widow, and their minor children; and, the widow having qualified as natural tutrix, and Antoine Jones having qualified as undertutor of the minors, the family continued to occupy the property as their home.

The Smiths are negroes, and, although the record is silent as to the amount of information possessed by the others, it appears that Louisa, the mother of the family, is wholly illiterate, and is now past 70 years of age. It also appears that the family have at times had dealings with Haspel & Davis (who conducted a business consisting, in part, of making advances and selling goods to small farmers), and that they have had some difficulty in getting along, as they were obliged at one time to let go the only property owned by them, other than that here claimed, in order to satisfy a debt due to that firm. They, however, preserved their homestead, and paid the taxes up to and inclusive of the year 1893. But the taxes of 1894, for some reason not explained, were left unpaid, and in May, 1895, the property was advertised to be sold (and was sold) on June 15, 1895, for the taxes, not only of that year, but also of the year 1893, which latter had been paid 12 months before; the adjudicatee being

H. C. Huntington, the stepson of the sheriff and ex officio tax collector, and himself, a deputy sheriff. According to the deed, the taxes of 1894, with all penalties and costs added (including an item "advertisement and cost $4.10") amounted to $22.85, and the taxes of 1893, with interest, etc., and with the item "advertisement and costs $4.10" duplicated, amounted to $14.65, making a total of $37.50. On June 23, 1896, Huntington executed an instrument somewhat in the form of a quitclaim deed, in which, for the consideration of $62.90 said to have been paid to him, he transferred to Haspel & Davis his interest in the property. He testifies that the amount stated was the exact amount that he paid for the property, including all costs and interest, but under what law the $37.50 paid by him had in little more than a year become $62.90 we are not informed. Within a few days after this last transaction, John Smith, one of the defendants, then a minor, called on the sheriff in regard to the property, and took further action, of which he gives the following account, to wit:

"He [the sheriff] said he had seen Mr. Haspel in town a couple of days before and he [Mr. Haspel] had received a letter from Antoine Jones [the boys' undertutor] for him to pay the taxes on the property, because Antoine Jones had a $150 mortgage on the property. So I goes down to see Antoine Jones and asked what about the taxes, and he told me I had to go to see Mr. Haspel. I went to town, me and my brother, Toney, went to town, and I saw Mr. Haspel about the taxes, and Mr. Haspel told us that the property belonged to him, and that he had paid five years' taxes on it. Mr. Haspel, or this gentleman [witness pointing to Mr. Davis, who is in the courtroom], Mr. Isaac Haspel, I told him that the property belonged to my father, and so he kept talking about it, and he said the taxes had amounted to $200, and he said it was no use to go to law about the property because the property belonged to him, and the only way for us to save the property was to pay him down $100. Q. Did you pay him any money? A. Yes, sir. Q. How much did you pay him? A. $60, the first payment. * * * Q. Did you ever pay him anything else? A. I think, in August, I paid him $40. * * * Q. Did you ever pay him anything else? A. Toney went the last time, and paid him $40. Tony said he paid him in cash. I was not there. Q. Did you ever pay him in any other way? A. We shipped him eight or nine barrels of rice."

When Mr. Davis (whom the witness in thus testifying had mistaken for Haspel) was being examined on behalf of his firm, he was asked:

"Q. Do you remember meeting Mr. Tibaut [the sheriff] on the street, in the city of New Orleans, a few days before you purchased this property, and you telling him to send you a statement of how much was due on that property, as you proposed to pay it for Antoine Jones?"

This question was objected to (as were all similar questions) by counsel for the plaintiff, on the ground that parol evidence was inadmissible to prove agency affecting the title to real estate, and counsel for interveners joined in the objection, which was sustained by the court. Subsequently, however, the objections of the interveners were withdrawn, and such testimony was admitted, as against the interveners, but not as against the plaintiff. And under this ruling there was introduced a letter from the tax collector to Louisa Smith, of date June 13, 1896, in which the writer regrets that he is unable to give further time (in the matter of the redemption of the property) on payment of $20 in cash, and informs Louisa Smith that the property belongs to his son, who is demanding the full amount, $60.50. He also informs her that Davis had told him a few days before, in New Orleans, to let him know the amount required, and that he would pay it for Antoine Jones; that he (Tibaut) had sent a statement of the amount to Davis, and was every day expecting the money; and that the only thing for her (Louisa Smith) to do was to pay Huntington the full amount before the 18th of the month. The witness (Davis), being still on the stand, was then asked with whom he had bargained for the property, and how he knew that Huntington had it for sale, and his cross-examination proceeds as follows:

"A. How did I know? Q. Yes? A. Why, the undertutor of the minors, Antoine Jones, wrote

me about it—wrote me or told me—that these people were unable to pay their taxes, and that the property had been sold, and that if Haspel & Davis would buy this property from Huntington it would be a favor to him, in this way; that if the said Smith could not redeem the property at the end of the year, that the estate owed him $150. Q. [Interrupting] That is Antoine Jones you are speaking of? A. Yes, and not being able to get the money out of the estate, he owing Haspel & Davis money, thought we ought to assist him in that way; and if the property was left to us after the expiration of the year, that we ought to try and hold him, and get this property at this nominal sum, to assist and give him credit for that $150; but there was no understanding, there was no understanding at all; he merely asked us to buy it as a stranger had a right to buy it. Q. Now, Mr. Davis what became of that letter? A. I don't know whether it was a letter from Antoine Jones or whether he told it to me, personally. He has been doing business with Haspel & Davis for years. He is a colored man; but I must say he is a very honest colored man. I purchased this property because it was worth the money to us and if he had not told me, perhaps I never would have purchased it. He merely called my attention to it. He would rather have seen me get it than a stranger, as it ·was to his interest. * * * Q. As I understand it Mr. Davis, Antoine Jones owed you some money; is that it, at the time you purchased this property? A. I believe he did? Q. Now, didn't you state so just now? A. I believe he did. Q. He owed you some money? A. Now, I don't remember whether he asked me to credit his account or give him the .money. I believe he owed us money and asked us to credit his account. * * * Q. And you considered that they [the Smiths] were entitled to redeem it at the end of the year? A. They had not only the right to redeem it from me but from the original purchaser."

Somewhat later the witness was asked whether the Smiths had made any demand for the transfer of the property, to which he replied:

"They did not, at that time, or at any other time. They never made any such demand of Haspel & Davis. The fact is, they knew better. They knew that we had bought this property; that we owned it; that we leased it to them, thinking they would try to rebuy it from us."

Cross-examination:

"Q. Did you ever see Louisa Smith? A. Never. Q. Now, how do you know what she knew. You said she knew, how do you know that she knew that you had bought it? A. From the simple fact that the tutor and her friend knew. Q. The tutor and your friend to whom you had given the $150 to defraud them out of their property? A. He did not defraud them. Q. When you gave him the $150, didn't you defraud them? A. No, sir. Q. Was it a legitimate transaction. Mr. Davis? A. Of course it was legitimate. The time to redeem the property had run out. and Mr. Huntington could have kept it. They had no more title to it, and I, wishing to help Antoine Jones to get his money, bought the property."

The witness undertakes to make it appear that Haspel & Davis have in some way (he is unable to remember how) made good to Antoine Jones the debt of $150 said to be due him by the estate of Smith, and, in testifying as to the amount which the property in question has cost his firm, he includes the $150 thus mentioned, with interest at 8 per cent., from a remote date, and produces an unsecured note, purporting to have been signed by Louisa X Smith, dated January 4, 1893, and payable to the order of Antoine Jones, but without his indorsement. All that the witness knows about the alleged debt to Jones is that the latter told him that it was due by the estate of Smith, together with the existence of the note, the mark attached to which he says he witnessed, though, as will be observed, he also testifies that he never saw Louisa Smith. There is testimony going to show that at some time, the date not being fixed, Haspel & Davis executed a written instrument in the shape of an option, consenting that the Smiths should redeem, or purchase, the property from them for $500, but the instrument has been lost, and we are unable to arrive at any definite opinion in regard to it. It is admitted that after the execution of the quitclaim from Huntington to Haspel & Davis, the Smiths paid the latter $135, on account of this property; the contention of Haspel & Davis being, that the payments were made in an effort to buy the property back, at $500, whilst John Smith, the minor with whom Haspel & Davis appear to have dealt, testifies that the payments were made under an agreement that Haspel & Davis

were to let go the property when they were paid $100.

When the defendants undertook to prove that the taxes of 1893 had been paid before the sale, there was objection from plaintiff (and interveners as well) on the ground that, by alleging that Haspel & Davis had intended to buy the property for Jones, the undertutor of the minors, and for them, they had estopped themselves to attack the validity of the sale, but the objection was overruled, and the proof, as admitted, shows conclusively that the tax was paid on June 18, 1894, and that the credit was duly entered in the book which the law (Act No. 85 of 1888, p. 139, §§ 85, 86) requires the sheriff and tax collector to keep for that purpose. In February, 1902, Haspel & Davis sold the property to the plaintiff, Doullut, who found the defendants in possession. His attempts, as a witness in this case, to show that they recognized him as the owner, are wholly ineffectual. What he has succeeded in showing is that he built a fence on the property, and that the Smiths cut or removed it, and reasserted their possession; that he then began a prosecution against Tony Smith for trespass, but abandoned it, and, in his capacity as president of the Bayou Cook Navigation & Fisheries Company, Limited (a concern which was engaged in business on the property adjoining), brought suit to expropriate this property, in which suit he was defeated on grounds relating to the legality of the organization of his company (Bayou Cook Navigation & Fisheries Co., Ltd. v. Doullut et al., 111 La. 517, 35 South. 729), and that it was not until March 14, 1903, more than a year after his purchase, that, in the proceeding now before the court, he caused the writ to issue under which the defendants were evicted. It will be seen from the foregoing that the propositions upon which the plaintiff and interveners rely are: (1) That defendants should not be permitted to prove their allegation with reference to the intention of Jones, or of Haspel & Davis, to redeem the property for their account, because that would be to allow them to defeat, and to establish, title to real estate by parol evidence; and (2) that they are estopped to prove that the tax sale by which their own, registered title is said to have been devested was an absolute nullity, because of the inconsistency of that position with the allegation above mentioned; whereby they, in effect (it is said), admit the validity of the tax title. It will also be seen that the result of the maintenance of the propositions thus stated will be the absolute suppression of the truth, and the wresting from defendants of property of which they have never been legally devested, for no better reason than that, in their efforts to defend themselves, they have made allegations both of which may be true, in point of fact, but which are thought to be inconsistent with each other, as a matter of pleading.

If it should be conceded that the allegations in question are inconsistent, nevertheless, there is nothing immoral in the inconsistency, and no injury to any human being has resulted, or can result, therefrom, unless it be held that, thereby, and for no other reason, the defendants must lose their property. We very much doubt, however, whether even the most liberal regard for the doctrine of estoppel requires such a subversion of the plainest principles of justice. That doctrine, whilst said by Lord Coke to be odious, because used to suppress the truth, is considered by more modern authorities a salutary one, odious only "when applied without the support of sound legal principles. It has, however," say the same authorities, "been guarded with great strictness, not because the party enforcing it, necessarily, wishes to exclude the truth, but because the estoppel may exclude the truth." 11 A. & E. Ency. of Law (2d Ed.) p. 388.

It has been said by this court that:

"Estoppel is not favored in law, and should not be permitted except in clear cases to defeat the object of the administration of justice, which is to discover and apply the truth," and that, "in order to justify the application of this plea, it must be certain to every intent and is not to be sustained on argument or by inference." Hornor v. McDonald, 52 La. Ann. 396, 27 South. 91 (citing Bigelow on Estoppel).

That mere inconsistency in pleading does not estop is included in the rule that one is not estopped by allegations unsuccessfully pleaded. Thus it has been held that one who is defeated in an attempt to recover property alleged to have been conveyed or covered by a simulated title, is not estopped thereafter, to sue for the price upon the basis of a bona fide conveyance (Goodwin v. Neustadtl, 47 La. Ann. 851, 17 South. 471); that defendant who sets up that his title is not valid, when sued for the price, is not estopped to defend his title, when sued for the land (Morgan v. Kinnard, 23 La. Ann. 645); that a bankrupt is not estopped to plead the nullity of a judgment because he has placed it on his schedule in the descriptive list of claims against him (King v. Pickett, 32 La. Ann. 1006). It is true that those were cases in which the inconsistent pleas were set up in different suits, but the principle involved is that where a litigant is entitled to recover in one of two positions, which conflict, he does not, by losing in the one position, estop himself from recovering in the other, merely because it conflicts with the position originally taken, and where it is the plaintiff who brings inconsistent demands, the only penalty is the dismissal of one of them; though it has been held that:

"Where all the promises and contracts are set out in the pleadings, if any one will authorize judgment, the court should render it. Irrelevant or useless matter does not vitiate the good." Rawle v. Skipwith, 19 La. 207.

If the allegations of the defendants which are thought to estop them were susceptible of no other construction than that which has been accepted by our learned brothers of the Court of Appeal, they are, at worst, merely inconsistent, and, at best, useless and irrelevant, since there is no allegation of a counterletter, and no attempt to establish title by means of interrogatories on facts and articles; and they, therefore, establish no basis for the defeat of plaintiff's title even if the facts alleged could have been sustained by proof. We think, however, that those allegations may be otherwise construed. The plaintiff sets up title through Haspel & Davis, who acquired from the adjudicatee at the tax sale. The defendants deny the allegations of the petition, save as specially admitted, and set up a title derived from James Smith, coupled with uninterrupted possession for many years. They aver the nullity of the tax sale, and allege that it conferred no title upon "the purchasers or any other person." They aver that the alleged transfer by the adjudicatee to Haspel & Davis was void and of no effect (1) because not acknowledged or authenticated; (2) because Haspel & Davis, being a commercial firm, could not acquire real estate; (3) because the instrument of transfer ' is not accepted by the transferee; (4) because there was no delivery, or taking possession; (5) because said instrument does not purport to be a sale. They, then, aver:

"That the amount advanced by said firm of Haspel & Davis and paid over to Harry C. Huntington, being the amount by him paid at tax sale of the property and costs and penalties added, was at the time intended as a redemption of the property by Haspel & Davis for the account of one Antoine Jones, the undertutor of the minor children of James Smith, who intended to redeem the same; the said Haspel & Davis purchasing as agent, and for the benefit, of the said minors and your respondents, and that the said amount has been refunded to Haspel & Davis by your respondents."

The main defense with which the answer begins, therefore, is that the tax was void "and conferred no title on the purchasers or any person." Then follows the averment that the alleged conveyance from the adjudicatee to Haspel & Davis was void, for reasons entirely apart from the want of title in the adjudicatee; a fact which had already been alleged. And then follows the allegation that

the alleged transfer by the adjudicatee to Haspel & Davis conferred no title, for the further reason that it was "intended" as a redemption of the property by Haspel & Davis on behalf of Jones, the undertutor, and of the defendants. But as defendants had already alleged that their title had not been devested at the tax sale, the allegation that Haspel & Davis and Jones intended to redeem does not amount to an allegation that they did redeem or could have redeemed property which was no more subject to redemption than if the tax collector had never attempted to sell it. The allegation in question was made by defendants, as we take it, merely by way of showing, as additional aggravation resulting from plaintiff's attack on their title, that under no circumstances could it be said that plaintiff's authors (Haspel & Davis) had ever acquired any title to the property which they undertook to sell; first, and fundamentally because the tax sale to the adjudicatee (their alleged author) was void; second, because the alleged transfer from the adjudicatee to them was void by reason of nullities of its own; third, because even granting that the adjudicatee had acquired a title, and granting that the land, having been legally sold for taxes, was subject to redemption, it was the intention to redeem it for account of the minors and the defendants. There is, therefore, in our opinion, no such inconsistency between the allegations of the defendants' answer as to have estopped them to prove the nullity of the tax sale, and the evidence on that subject was properly admitted.

Interveners attempted to show that defendants had acknowledged their ownership of the land in question by renting from them, or by agreeing to purchase, and are precluded by another species of estoppel; but, as is patent from what has been said as to the contents of the record, the attempt has been unsuccessful. People who are kept in ignorance of their rights are not readily estopped by admissions in cases of this character. "It may be laid down as a general rule," says a well-recognized writer, "that where an irregularity of such a character as to affect the power of the officer to sell, takes place in any part of the proceedings, and the owner of the land, being aware of the fact, is silent, and takes no steps to prevent the sale, but permits it to proceed, or, even actually consents to waive the irregularity, a sale under such circumstances will not be recognized in a court of law. The officer derives his authority from the law, and not from the consent of the owner. He must obey the law, and not the order of a private individual. When he keeps within the pale of his authority, minor irregularities may be cured or waived by the party in interest, without injuring the official character and validity of the proceedings; but the authority itself or any substantial link in the series of acts which are necessary to establish the existence of the power, cannot be supplied or enlarged so as to give official character and validity to acts not authorized or sanctioned by the plain provisions of the statute." Blackwell on Tax Titles (4th Ed.) p. 513.

It only remains to be said that the sale of the property for taxes, part of which had been paid, was void, and that such a sale is not protected by the prescription of three years established by the Constitution. Rougelot v. Quick, 34 La. Ann. 123; Lefebre v. Negrotto, 44 La. Ann. 792, 11 South. 91; Const. art. 233.

It is therefore ordered, adjudged, and decreed that the judgment of the Court of Appeal, which has been made the subject of review, be annulled, avoided, and reversed, and that the judgment herein rendered by the district court be now affirmed, at the cost of the appellants. It is further adjudged and decreed that said appellants pay the cost of this application.

.See dissenting opinion of PROVOSTY, J., 41 South. 918.