No. 12,874.

SUCCESSION OF MRS. REBECCA ARBUCKLE STEWART.

SYLLABUS.

The opening of the letter containing the olographic will.

1. SEALED LETTER.—The opening by the lawyer of the envelope containing an olographic will, gave no good grounds for complaint, and was not insisted upon as an objection.

2. FAMILY DIFFERENCES.—There was no marked sympathy by the testatrix for the members of her family or those of her husband's family, and the only difference between the two was that the testatrix may, at the last moment, have had a decided preference in matter of disposing of her property in favor of her blood relative.

3. PROBATE OF THE WILL.—The evidence identified the will and showed that it was in the hand-writing of the testatrix.

4. DATE OF THE WILL.—The evidence of witnesses and experts sustained the date claimed by the proponent of the will.

5. LEGIBILITY OF THE WILL.—The meaning of the will was interpreted as the whole context made evident it was the intention of the testatrix it should be interpreted.

6. SUGGESTION.—There was no evidence that suggestion was brought to bear upon the testatrix to influence her in the construction of the will.

Succession of Stewart.

ON APPEAL from the Civil District Court for the Parish of Orleans. *Ellis, J.*

*R. H. Browne* for Miss Jenny Dornan, Proponent of Will, Appellee.

*James D. Seguin* and *Charles J. Theard* for Opponents and Appellants.

Argued and submitted April 19, 1899.
Opinion handed down May 1, 1899.
Rehearing refused June 27, 1899.

The opinion of the court was delivered by

BREAUX, J. The deceased, late wife of William A. Stewart, departed this life on the 26th day of July, 1897, leaving a nuncupative will by public act, dated the 13th day of April, 1896.

In this will, she bequeathed five hundred dollars to her sister, a resident of California; to her husband the enjoyment of her property, and at his death it was to be equally divided between her two legatees, her sisters-in-law named in the will. She appointed her husband and James Benson, executors.

This will was presented for probate by her surviving husband on the 13th day of April, 1896.

A niece of the decedent, Miss Jennie Dornan, alleging that this will by public act had been revoked by an olographic will made since the date of the nuncupative will, appeared in court and filed an opposition to the application of the surviving husband.

She averred that the olographic will being subsequent in date should be probated and its execution ordered instead of the nuncupative will.

Out of the contest between the legatees of these two wills arose the issues before us for determination.

The inventory shows that the separate property of the
decedent was appraised at.........................$ 700 00
The property belonging to the community between the
decedent and the surviving husband................ 8391 00
                                                    ──────────
    Total.........................................$9091 00

The executor and the legatees under the nuncupative will attacked

the olographic will, and urge that it was not written, dated or signed by the decedent, and if written by the decedent, it was illegible and undecipherable, with no certainty as to its date, save that if it was a will at all, it was of a will of a date prior to April 13th, 1896, and that it follows it did not revoke the will of April 13th, 1896; that after the last mentioned date, the decedent was physically and mentally incapable of writing an olographic will; but that if it was in her handwriting, then it was brought about by imposition and deception, and that she was not aware of the sense of the words used.

As relates to facts, we find that the evidence shows that the mother of the proponent was, at the dates of the two wills, an invalid sister of the testatrix, Mrs. Stewart, who also had two sisters in California and a brother in Ireland.

The proponent, as a witness in her own behalf, swore that her aunt, the testatrix, wrote the olographic will in her presence, on the 29th of June, 1896, in the forenoon, in the parlor of the home of the testatrix and of her husband, which was also the dwelling place of the two sisters of the husband, legatees under the nuncupative will.

This witness also swore that on the day the will was written, she, at the request of her aunt, wrote a letter to the sister of the testatrix; that immediately after the witness had written this letter, the testatrix wrote her will, folded it up, put it in an envelope, sealed it and gave it to her and advised her not to let it be seen by any one.

The evidence also disclosed that this witness said to Mistress M. M. Burbank, also witness in the case, that, in July, 1896, her aunt made a will in her favor.

The evidence of this witness also shows that, five or six days after the death of the testatrix, she handed the will to her lawyer and requested him to open it and read it.

The attorney testified that a few days before the filing of the will for probate, the proponent whom he had known for many years, brought him the envelope, which had the endorsement: "The Will of Rebecca Stewart;" that it was nicely sealed and clean, as if it had been preserved with great care. Proponent said to him that she did not know the date of the will and requested him to unseal and open the envelope and see the date of it, to ascertain if the date of the will was before or subsequent to the date of another will she understood had been made.

The attorney on cross examination said that he thoughtlessly

opened the will; that had he given the matter a moment's attention, he would have presented it in court unopened.

Proponent testified that her aunt was in feeble health, that when she wrote the will her hand trembled, but that her mind, however, was unaffected and apparently sound. She died about a year afterwards. The ink and pen with which the testatrix wrote the will in her presence were brought into the room by a little girl, a daughter of Mrs. Dwyer. She was not certain about the paper, as it may be, she said, that she brought paper to write a letter for her aunt, upon which we understood the witness to mean a will also was written. The letter written by this witness was returned from California and introduced in evidence. It is evidence as a matter of truth that the letter was written as stated by the witness. The little girl, on the other hand, as a witness, denied that she brought pen and ink into the room.

Another witness, Miss McGuire, swore that she had frequently seen the late Mrs. Stewart write; that she felt sure the will was in her handwriting. She, however, was unable to read the whole will.

Judge J. C. Moise and Mr. Percy Benedict, both experts in matters of hand-writing, testified at length in the case. The former stated that he has had an experience of more than fifteen years in the examination of writing and the characteristics of writing. After an examination of the paper and comparing it with thirty-one receipts signed by the testatrix, and after having made notes of the peculiarities of the handwriting, this expert testified that it was a genuine document written by a person who was very ill or nervous. Further, that the person who signed the will, is the same person who signed the receipts. In other words, in substance, that the will was genuine.

Passing in making out our statement of facts to the question of the date of the will we find as a fact that the experts said that the last figure of the year as written in the will is a "6".

We quote from his testimony: "I will tell you, when I first got this will I could not tell what that was ,and I only discovered and came to my conclusions that it was a '6', by comparing the 6's in the receipts. I saw plainly an attempt to make a '6', but the tremor of the hand was so, it did not do it nicely." There is other evidence of this expert to the same tenor.

Another expert, Mr. Percy Benedict, said that his opinion was absolutely unprejudiced. At the time that he made his examination, he did not know who were the interested parties and who were their

attorneys. His conclusion was, after comparing receipts undisput-ably written by Mrs. Stewart, with the will, that the one who wrote the receipts signed the will. He found the chirography quite bad at first and almost unintelligible, but after having familiarized himself with the handwriting, he thought that he had deciphered nearly every word of it. There were missing letters in a number of words which the witness thought the writer intended to insert. It appeared to him that the one who wrote the instrument, was at the age of de-crepitude or was very feeble.

The judge of the District Court, after having examined the instru-ment and heard the witnesses, gave it as his opinion that the will is a genuine will, and found that its genuineness had been demonstrated by the testimony of the experts; that the following is the proper read-ing of the will made part of the judgment: "New Orleans, June 29th, 1896. I want my niece, Jennie Dornan, to have my property, real and personal, when I die. I appoint sole executrix of my estate. (Signed) Rebecca Arbuckle Stewart"; and that the original read: "New Orleans, June 29, 1896. I want my nese Jenny Donan to hav muy portoy and porionn when I die. I point sole execytrix of muy estate. Rebecca Arbuckle Wlson Stewart."

The learned judge, in his opinion, said in part:

"The date being thus proven and read as written, it is not very difficult to read the will. The trembling hand and shattered nerves failed to obey the will in most of the words, and there are omitted letters and misspelled words, but there are letters enough in each word to show the intended word with the words which are plainly written and which can easily be read. The context supplies any de-ficiency or inaccuracy of spelling and makes the entire will a legible instrument. Written words are at best but symbols of ideas. Ab-breviations are used for full words by the best writers. They ex-press the idea, the sense and meaning, and that is the object of all writing. In this case, Mrs. Stewart had a peculiar handwriting, but a very characteristic one. Her spelling was peculiar also. Thus the word 'my' she spelled 'muy', but the sound is the same. The most obscure word in the will begins with the letter 'p' and ends with the syllable 'ty'. It cannot be read for it has not the letters to spell any word, but the context makes it plainly 'property' as the intended word, for with that word the sentence reads: 'I want my niece to have my property, real and personal, when I die.' Without this in-

terpretation the sentence has no meaning, for no other word can be·
substituted."

The judgment of the District Court rejected the demand of the
opponents to the will and decreed that it is genuine, and ordered it
to be executed. From that judgment the opponents appeal.

1. In passing we note that the circumstances under which the en-
velope with the endorsement, as before stated, was placed in the hands
of the judge for its probate, do not give rise to the least ground of
objection, save that there was some failure to comply with the strict
letter of the Code. The non-compliance does not present a serious
question, in. our view, and cannot have the effect of destroying the
will, if it be genuine. This objection was not pressed, as we take it.
It was passed by counsel without comment.

2. We did not glean much from the evidence to denote that there·
was any exceptional sympathy on the part of Mrs. Stewart, which
prompted her in signing either of the wills made by her at dates not
distant one from the other. The respective parties to the contro-
versy appeared to have enjoyed, in a general way, to the last, her:
sympathy and good will. The opponents, on the one hand, and their
witnesses sought to prove that her relations with her niece were not
all pleasant, while, on the other hand, the niece, proponent, attempted
to show that she disliked her sisters-in-law, the opponents, at whose·
home she resided. The dispute on this point was pretty well sus-
tained by each of the contending parties. We will not note down
accounts of family differences of no importance, frequently magni-
fied or minimized by parties concerned, in the direction suggested by
motives of interest. The testimony of one, in our judgment, about
sets off that of the other, save, however, that in giving consideration
to this branch of the subject, it cannot well be. overlooked that the
niece was united to the testatrix by ties of near kindred, and that she
was the support of her invalid mother, the sister of the testatrix.
They were of the same blood. Every one knows that nearly always
this has its power at the last moments of the one departing. Her
husband was an aged man and sickly. He made his will at the date
that Mrs. Stewart signed her first will, and left his property to his
sisters. He also departed this life a short time after he signed his
will and not many months after the death of· his wife. Both had
reason to feel that the end was not far, and that, under the will, in
authentic form, whoever of the two survived and inherited the prop-

erty, would receive and inherit it for the benefit of the husband's kin, for such was the disposition of the property of the wife under the first will. A change in disposing of the property on the part of the wife, if such a change was made by her, was not at all unnatural under the circumstances.

3. We take up next for consideration the few brief lines of the will.

After careful examination we feel certain that the will was written by the late Mrs. Stewart, and that its date is the 29th of June, 1896. We felt no great difficulty in arriving at the conclusion that the instrument was genuine. All the facts point to its genuineness, except minor details which cannot have any serious bearing toward refuting well proven facts. The hand-writing is peculiar, but no one has imagined that any attempt at imitation or falsification was practiced in matter of the hand-writing. There is nothing of record giving rise to the inference that any other but the testatrix wrote this will.

We have seen that one witness swore that she was present when the will was written, whose evidence is corroborated in some respects, at least. True it is that the other witnesses who testified regarding the genuineness of the hand-writing of Mrs. Stewart, on cross-examination said that she could not decipher the context of the will. She did, however, decipher some of the words.

In our judgment, a person may be a competent witness to prove the genuineness of a will without being able to decipher all the words written. It happens frequently enough that one cannot read the words of a letter, although he is quite certain, from his familiarity with the handwriting of the writer, that the letter is in his (the writer's) handwriting.

4. This brings us to the question of the date of the writing.

The testimony sustains the date as being correct, as relates to the year 1896. The testimony on this point is uncontradictory, as we take it. No one has assumed to say, as a witness, that it was not 1896, although the figure "6" is not clearly written. To find otherwise, we would have to conclude that one of the witnesses who swore that she was present when it was made, swore falsely, and that the testimony of the two students of hand-writings and their characteristics was entirely erroneous and not trustworthy. We know that ordinarily the testimony of experts, in matter of hand-writing, uncorroborated, is frequently taken as being of little value; but here the testimony of

these two experts is direct and clear. Their conclusions are sustained by highly intelligent analysis of every word, and letter of each word, after painstaking comparison with instruments of writing known, or admitted to be known, to be in the hand-writing of the testatrix.

These experts are, as we take it, skilled in the examination of hand-writings, and have been a number of times called upon to decide the genuineness and the meaning of written words.

The testimony of the witness who was present when the testatrix wrote her will, finds corroboration in the date of a letter written for her aunt to her sister in California, bearing the same date as the will. The letter and the envelope, duly stamped, are of record.

The coincidence is too striking and too forcible to be considered discredited by the testimony of a little girl, who may have forgotten all about bringing pen and ink to the witness, Miss Dornan, as stated by her.

The letter, the testimony of the witness, and that of the experts are affirmative and clear. We do not think we should disregard these facts under the circumstances.

With reference to the date of wills, we quote from Laurent, Vol. 13, p. 203:

*Quant au point de savoir si la date surcharge est lisible ou non, c'est e'videmmont une question de fait".*

*"Surcharge"* has the meaning of a date written over a prior date. As a *"question de fait,"* in our judgment, it is sustained by the evidence.

5. The averment that the will is illegible and unreadable gives rise to the next issue before us for decision.

The Louisiana Code contains special rules for the interpretation of legacies, directing, in the interpretation of testaments, that the intention of the testator should control, without, however, overlooking the words and expressions. The second rule embodies the maxim: *magis ut res valeat quam periat;* that a "disposition must be understood in the sense in which it can have effect, rather than that in which it can have none". Civil Code, Arts. 1712, 1713.

Those rules controlled in 6th Ann., 172, State of Louisiana, etc. vs. Executors of John McDonogh, holding: "Courts may go further in cases of testaments than in contracts in disregarding the meaning of words used, and even supply words omitted when they may be materially restored." Under that decision, may not an interpretation be

given to a will evidently in accordance with the meaning the testatrix intended it should have?

In line with the decisions of this court, in Burthe, Tutrix, vs. Denis, Executor, 31st Ann., 568, Judge Spencer, for the court, reviewed the authorities at some length bearing upon the subject here, and said: "The court is authorized to resort to all the circumstances which may throw light upon the matter when, from the terms used by the testator, his intention cannot be ascertained." Citing a number of decisions.

In the case in hand, as relates to intention, there is no ground for consulting surrounding circumstances. We only have to read the testament, as the words make it plain what it should be. When examining and pondering over this branch of the case, we asked ourselves the question: What could she have meant by the words used, if she did not thereby mean that her niece should inherit by her will all her property and her personal effects?

As relates to the necessity of consulting and of discovering the intention of the testator, if it can be done, foreign jurisprudence accords with our own.

In Laurent we read:

"*Le juge peut il corriger des erreurs de redaction.* * * *S'il a mal exprime sa pensee, c'est son intention qu'il faut recherche. Comment peut-on las connaitre? L'article 1161 (1949 Old La. Code) porte: 'Toutes le clauses des conventions s'interpretent les unes par les autres, en donnant a chacune le sens qui resulte de l'acte entier'. C'est une regle d'interpretation que l'on doit suivre pour toute espece d'ecrits".* Vol. 14, p. 165.

The decision from which we have quoted above contains the statement: "Such seems also to be the rule at common law"; expressed also by the maxim: *"Voluntas potius quam verba spectari placuit."*

The case here is much stronger, for it only requires that the meaning conveyed by the text should be given.

7. Opponents urge that the illiterate testatrix could never have devised such a document, free and uncontrolled. In other words, that there must have been suggestion or improper influence brought to bear.

In answer we can only say that there is no evidence before us of suggestion or captation. The visits, care and attention of relatives are not reprehensible in themselves, and cannot have the effect of viti-

ating the will, in order to give ground for assailing the will on the basis of captation or suggestion. When admissible at all, there must be fraudulent or violent captation or suggestion. This cannot be presumed. Proof must be made of it, by the heirs or legatees.

We have given to this case all the attention possible and have carefully reviewed all issues to this point and noted them, save the issue growing out of the difference in paper and ink used in constructing the will. On this point we have not found it cause enough to annul the will. The affirmative is sufficiently corroborated to prove that the paper was furnished to the testatrix. This view is sustained on the theory that it was as proponent swore. She did bring paper to the testatrix; and it may be on one of the sheets brought, she wrote a letter for her aunt, and on the other her aunt wrote her will.

After we had arrived at the conclusion that the will had been written by the testatrix, there remained only the question of the date of the will, which we have heretofore considered and passed upon.

For reasons assigned, it is ordered, adjudged and decreed that the judgment appealed from be affirmed.