On the Merits.
In this case, his honor, Mr. Justice O’NIELL, being recused, and their honors being evenly divided in opinion as to the proper determination to be made of the issues involved, Judge OHABLES F. CLAI-BOBNE, of the Court of Appeal for the parish of Orleans, having been called upon by previous order of this court to sit in the case, pronounced the judgment of the. court therein, in words and figures, as follows, to wit:
CLAIBOBNE, Judge ad hoc. On December 1, 1914, Bev. James H. Trainor, a resident of the parish of Orleans 'filed a petition in the district court of the riarish of St. Mary, *60 In which he alleged that Miss Caroline Le-fort, a resident of said parish, died on November 29, 1914; that she left an olographic testament, dated Franklin, La., May 26, 1909, by which she constituted a number of legatees, and in which is the following clause, among others:
“I bequeath to the priest of this church the sum of two thousand dollars and I appoint him executor of this will without bond.”
Petitioner further alleged that he was the priest of the Catholic church at Franklin on May 26,1909, date of the will, which was the church of the deceased, and that he was the executor appointed, by said testament; that he accepted the trust and desired to be confirmed as executor. He prayed for the probate, registry, and execution of the testament, and to be confirmed as executor thereof.
After due proof of the testament, its execution was ordered by decree rendered December 1, 1914, and petitioner James H. Trainor, was confirmed testamentary executor, and letters as such issued to him, and an inventory was ordered taken.
As a part of the proceedings in taking the inventory, the notary made the following report:
“In addition to the above personally I found in one of the drawers of the armoir in the upstairs bedroom certain papers, three in number, contained in an envelope, marked:
‘Eev. Father to be opened
three days after
My last will 1913 — 1913’
—which I have marked with my paraph as follows: ‘Documents found in effects of Miss Caroline Lefort.’
“[Signed] C. J. .Boatner, Notary Public.”
On January 23, 1915, Sam Serio, the Most Beverend James H. Blenk, Archbishop of New Orleans, the Church of Assumption, Eev. J. J. Eousseau, and Widow Camille Levy filed a petition in which, after reciting all the facts related above, they alleged:
That the document found by the notary and mentioned in his inventory and dated “May 26, 1913,” and signed “F. C. Lefort,” is-entirely written, dated, and signed by the deceased, Frances Caroline Lefort, and is her last will and testament, and has the effect of revoking, and in fact does revoke, the will of May 16, 1909, heretofore probated.
That said testament of May 26, 1913, appoints “the pastor of this church administrator,” and that Eev. J. J. Eousseau is now, and was at the time of the death of Miss Lefort, the pastor of the church at Franklin, and that therefore the said Eousseau is the person appointed executor of said testament.
That petitioners are named as legatees by said testament of May 26, 1913, and they present the same for probate and execution.
They further aver, in the alternative, that should the court decide that the first will of May 26, 1909, is the last testament of the deceased, there is error in that portion of the decree, confirming Eev. J. H. Trainor, executor, for the reason that he was not the priest of the church at Franklin at the time of the death of the testatrix, but that one of the petitioners, namely, Eev. J. J. Eousseau, was the priest of said church at the time of the death of Miss Lefort, and that he should be decreed to be the person appointed by the testatrix as executor and confirmed as such.
They prayed that Eev. Jas. H. Trainor and the legatees under the first will of 1909 be cited in order that it might be decreed contradictorily with them: (1) That the document dated May 26, 1913, be decreed to be the testament of the deceased, Miss Lefort, and that it be probated and ordered executed; and (2) that Eev. J. J. Eousseau be confirmed as executor thereof in place of Eev. Trainor; and (3) that the decree, ordering the probate and execution of the will of 1909 and confirming Eev. James H. Trainor as executor thereof, be revoked and set aside; and (4) in the alternative, and in case said testament of 1909 be maintained, that the order confirming James H. Trainor executor be re- *62 yoked, and that Rev. 3. 3. Rousseau be confirmed executor, and that letters as such issue to him.
The document mentioned above is dated in the following manner: “Franklin May 26 19 .” The “6” in the “26” is not made perfectly. After the “19” follow two figures which at first sight appear to be “08” It looks as if the figures “13” had been previously traced in smaller figures under the “08” but not very distinctly to the naked eye, or that the figures “08” had been overcharged, or surcharged, or superimposed over the figures “13.” It seems as if an attempt had been made to erase the figures “13” or “08,” for they are both soiled and blurred, especially the “0.” Then follow in distinct characters the figures “1913.”
The defendants, in their answer, interposed the plea of no cause or no right of action. But as this plea is inseparably connected with the merits, we shall treat the 'two together. Besides, the defendants proceeded to the trial of the case on the merits without asking for a separate judgment on the exception. It is now too late. Doullut v. Smith, 117 La. 491, 41 South. 913; Ashbey v. Ashbey, 41 La. Ann. 138, 5 South. 546; Turpery v. Edmondson, 32 La. Ann. 1146. But we are of the opinion that the petition does disclose a cause of action, and that the judge below acted correctly in overruling the objection to the introduction of evidence based on that exception.
The defendants answered, asserting the validity of all the proceedings probating the will of 1909 and confirming Rev. J. H. Train- or executor.
Further, they .denied that the document presented by plaintiffs is dated May 26, 1913, but they admitted that all that appears thereon is in the handwriting of the decedent, except the figures “1913,” which appear at the extreme right-hand top corner of said document which they allege, are not in her handwriting, and were not made by her; that even if the document is a valid testament, it would not have the effect of revoking the testament of 1909; they admit that Rev. 3. 3. Rousseau was pastor of the Catholic church of Franklin about the time of the death of the testatrix, and that Rev. 3. H. Trainor was not the pastor at that time.
They further aver that the document offered for probate by plaintiffs as the testament of deceased is absolutely null, void, and of no effect for the following reasons, viz.:
First. That said document is without date.
Second. That if it has any date, it is that of 1908.
Third. That if said document ever was a testament that it has been revoked.
Fourth. That it is interlined, erased, changed, and mutilated, and is uncertain, obscure, meaningless, and does not contain any bequest to any one except Mrs. Levy, and that it is impossible of effect as a testament.
They pray that plaintiffs’ demand be rejected; and, in the alternative, in case the document propounded by the plaintiffs be probated as a testament, that it be decreed to be dated in the year 1908, and in all events, that the defendants be recognized as legatees under the testament of 1909.
On motion of defendants the case was fixed for trial on the merits for February 23, 1915, then postponed to March 2d, when it was tried during two days.
The plaintiffs put upon the witness stand an expert in handwriting to prove that the figures “13” were in the handwriting of the testatrix, and that the figures “08” had been written over these figures by a strange hand, and that the figures “1913” were in the handwriting of the testatrix. The defendants objected to this testimony on the ground that a will cannot be proved by expert testimony. The objection was overruled and the testimony admitted.
The expert was also asked whether, in his *64 judgment, the figures “08,” which he had stated to have been superimposed or written over the figures “13,” had been written by the same party that wrote the figures “13.” The objection was made that there was no allegation of erasure or addition, and that the question was a contradiction of the pleadings and took the defendants by. surprise. These objections were also overruled.
The case was fixed for argument for May 1, 1915. On April 29th the defendants filed a petition to reopen the case, on the ground that the court, over their objection, had permitted E. A. O’Sullivan, the expert, to testify that the document annexed to plaintiffs’ petition was dated May 26, 1913, and that the figures “08” were not in the handwriting of the testatrix, but had been placed there by some other person, although the plaintiffs had alleged that said instrument was entirely written, dated, and signed by the testatrix, and had not charged that the figures “08” were forged or added by the hand of another person; that they were taken by surprise by such ruling, and were not prepared to offer expert .testimony in contradiction; that they are now prepared to prove by the testimony of Prof. L, C. Spencer, of New Orleans, an expert in handwriting, that the figures “1913” in said testament are not in the same handwriting as the body of said instrument and were not written by the same person, and that the figures “08,” under the figures purporting to be “13,” are in the same handwriting as the body of the instrument; that the figures “13” were written over the figures “08” by the same person who wrote the figures “1913.” To this petition is annexed the affidavit of L. O. Spencer that he will- swear to all the allegations of the petition.
On May 10th the court refused to reopen the case, and ordered the affidavit of L. C. Spencer to be stricken from the record.
On May 13th, the defendants filed an application for a rehearing of their petition to reopen the case on the ground that they had discovered new evidence, consisting of the testimony of Benjamin Ory, another expert in handwriting, who Would swear that the figures “1913” were not in the same handwriting as the body of the instrument. This application was also supported by the affidavit of Benjamin Ory.
The court also refused this application. Defendants reserved bills of exception to both rulings.
The district judge refused to probate the will of 1913, on the 'ground that the date of the month was uncertain; that he could not determine what was the figure after May 2 ; that it might be an “0” or a “6,” or something else, and, therefore, declared that the document presented was not an olographic testament under the law of Louisiana. But the judge decided that although Rev. J. H. Trainor was the priest of Franklin at the time of the date of the will (1909), Rev. J. J. Rousseau was the priest at the time of the death of the testatrix, and that he, Rousseau, was the party intended as executor by the will, and he confirmed him and revoked the appointment of Rev. Trainor.
Sam Serio, the most Reverend James H. Blenk, the Church of Assumption, and Rev. James H. Trainor have appealed.
The appellees have answered the appeal, praying that the judgment be affirmed in so far as it decrees that the document of 1913, presented by the plaintiffs, is not a testament, and reversed in so far as it recognizes Rev. J. J. Rousseau as executor.
The issues therefore are:
First. Did the court err in permitting an expert in’ handwriting to testify in support of plaintiffs’ allegation that the figures “1913” were written by the testatrix, and that the figures “08” had been written over the figures “13” by a strange hand, and that the “13” was in the hand of the testatrix?
*66 Second. Did the court err in refusing to reopen the case?
Third. Were the figures “1913” written by the testatrix?
Fourth. Did the testament of 1913 revoke the one of 1909?
Fifth. Whom did the testatrix intend to appoint as executor, the priest who was officiating at the date of her will, or the one who was acting on the date of her death?
[3] I. Up to the year 1896, when Act No. 119 was passed amending article Civil Code 1655 (1648) the law read:
“The olographic testament * * * must be acknowledged and proved by the declaration of two credible persons, who must attest that they recognize the testament as being entirely written, dated and signed in the testator’s handwriting, as having often seen him 'write and sign during his lifetime.”
In the interpretation of that article, the Supreme Court has repeatedly decided that, in cases of controversy concerning the genuineness of a will, the testimony of experts in handwriting was admissible to prove that the writing on the document propounded as a will was or was not in the handwriting of the testator. In the case of the Succession of Gaines, 38 La. Ann. 123, 128, the Supreme Court said:
“We understand that rule [C. C. 1655] to apply to the probate of a will which is not opposed, as a part of the mortuary proceedings. * * * But a different rule applies when the probate of the will is opposed ab initio, on the ground that it is a fraud and a forgery. In such a case the denial of the genuineness of the will removes the contest from the domain of article 1655 of the Code, and it presents an issue which must be determined under the rules which govern all contests involving the genuineness of a signature which is denied, and in such a case the burden of proof is on the party who relies on the genuineness of the proffered signature. C. C. 2245. C. P. 325. Under such an issue the doors of justice are opened for the introduction of legal evidence, under all the forms which prevail in all contested facts or cases; and the textual provisions of the law recognize the mode of testing signatures by a comparison of the writing. [Plicque & Le Beau v. Labranche] 9 La. 559; [Sophie v. Duplessis] 2 La. Ann. 724; [Aubert v. Aubert] 6 La. Ann. 104; [Pena v. Cities of New Orleans & Baltimore] 13 La. Ann. 86 [71 Am. Dec. 506]; Succession of McDonogh] 18 La. Ann. 419.”
In the case just quoted of the Succession of Gaines, experts in handwriting were imported from New York to obtain their opinion. In reference to experts the court continues, on page 133 of 38 La. Ann.:
“In this connection, it is contended by counsel for Mrs. Evans that comparisons of handwrit ings with each other and expert testimony on the same subject find little favor under the laws of Louisiana, and are very often precarious and dangerous. * * * Counsel are mistaken in the proposition that such modes of verifying signatures have but little force in Louisiana. Both modes are recommended by the very text of our law. C. C. 2245. C. P. 325.”
C. C. 2245 (2241) reads:
“If the party disavow the signature, * * * it must be proved by witnesses or comparison as in other cases.”
O. P. 325:
“If the defendant deny his signature in his answer or contend that the same has been counterfeited, the plaintiff must prove the genuineness of such signature either by witnesses who have seen the defendant sign the act or who declare that they know it to be his signature, because they have frequently seen him write and sign his name. But the proof by witnesses shall not exclude the proof by experts or by a comparison of the writing, as established by the Civil Code.”
In Succession of Stewart, 51 La. Ann. 1553, 26 South. 460, the Supreme Court was controlled, in its opinion, by the testimony of experts.
It will thus be seen that there are also three methods of proving handwriting in cases of wills, viz.:
First, by witnesses who have seen the party write the document;
Second, by witnesses who know the writing for having often seen the party write and sign; and
Third, by comparison of handwriting and experts. Ticknor v. Calhoun, 29 La. Ann. 279; Succession of Leonard, 21 La. Ann. 524; Plicque & Le Beau v. Labranche, 9 La. 562; Succession of Morvant, 45 La. Ann. 212, 12 South. 349.
*68 The ruling in Succession of Oaines, 38 La. Ann. 123, was merely an affirmance of previous opinions in Moses Fox v. Succession of McDonogh, 18 La. Ann. 419, 444, Succession of Roth, 31 La. Ann. 315, 320, and Succession of Clark, 11 La. Ann. 124, 127.
But Act 119 of 1896, p. 168, has eliminated from C. C. 1655 the phrase “as having often seen him write and sign during his lifetime,” and broadened the field from which the witnesses may gather their knowledge of the handwriting of the deceased.
The defendants have quoted in support of their objection a large number of French authors ; but they can have but little influence in the decision of this question from the fact that the Code Napoleon contains no article corresponding with the articles of our Civil Code 1655 and 2245 and C. P. 325.
We are equally of the opinion that the court below was right in overruling defendants’ objections, and permitting the plaintiffs to show that the figures “08” were not in the handwriting of the testatrix. It did not contradict their pleadings. They alleged that the document found by the notary was dated May 26, 1913, that it contained the olographic testament of the deceased, and was entirely written, dated, and signed in the handwriting of the deceased, meaning that part which composed the will. They did not allege that the “08” was in the handwriting of the deceased; it was the defendants who claimed that the will should be decreed to be dated in the year “1908.” To defeat that allegation, plaintiffs had a clear right to show that the figures “08” were not in the handwriting of the deceased, and had been added by the hand of another, and therefore formed no part of the will. C. C. 1589 (1582).
[4] II. Nor do. we think that the court erred in refusing to reopen the case for the purpose of hearing the testimony of the two experts in handwriting mentioned by the defendants, and in ordering the affidavits of these two experts to be stricken from the record.
The case had evidently been closed, since defendants moved to have it reopened. In such cases the Code of Practice provides:
“Art. 484. After all incidental questions shall have been decided, and both parties have produced their respective evidence, the argument commences; no witness then can be heard, nor proof introduced except with the consent of all the parties.”
This article has been interpreted to mean that, after all parties have announced that the testimony is closed, neither party has a legal right to introduce further evidence, but that the privilege of doing so may be granted by the court in its discretion and in furtherance of justice. The judgment of the court refusing to admit further evidence will not be reversed by this court unless it is manifestly erroneous and productive of injustice. See Vicksburg Liquor & Tobacco Co. v. Jefferies, 45 La. Ann. 621, 632, 12 South. 743, State v. Chandler, 36 La. Ann. 177, and School Board of Union Parish v. Trimble, 33 La. Ann. 1073, 1079.
In Parker v. Ricks, 114 La. 942, 947, 38 South. 687, 688, presenting many points of resemblance with this case, this court said, in passing on a motion to reopen the case to offer further evidence:
“After a case has been submitted and months have elapsed, a party to the suit has no right to reopen it to introduce new evidence. There •remained nothing to do save to decide the case” (quoting many authorities).
We think this case comes under the rulings made in the above cases.
On January 23d, plaintiffs filed their petition for the probate of the 1913 will. On February 13th, the defendants filed their answer, in which they averred that the figures “1913” were not in the handwriting of the decedent and were not made by her, and that the will was dated 1908. These two allegations presented the pivotal point of the *70 case. • On motion of the defendants the trial of the case was fixed for February 23d. It was postponed to March 2d, when it was tried during two days. The plaintiffs offered the expert on handwriting as a witness to prove the genuineness of the figures “1913.” Defendants objected, and over their objections, the expert was examined by plaintiffs and cross-examined by defendants. He swore that the figures “1913” were genuine, and that the figures “08” were not written by the testatrix. Defendants then offered two witnesses, who testified that the “1913” were not in the handwriting of the testatrix. On April 7th defendants moved to submit without argument. Notwithstanding plaintiffs’ objection, the argument was fixed for May 1st. . On April 29th, nearly two months after the trial, defendants filed the motion to reopen the case, and for permission to offer as witnesses two experts who would swear that the figures “1913” were not written by the testatrix, on the ground that they were taken by surprise by the ruling of the court admitting the testimony of the plaintiffs’ expert. Defendants knew that the turning point in the case was the genuineness vel non of the figures “08” and “1913,” for they had raised the point themselves. If their attorneys were taken by' surprise by the ruling of the court, although it was in line with the well-established jurisprudence of the state, the time to express it was on the trial of the case, on March 2d. There must be an end to litigation.
Of course the affidavits annexed to the motion to reopen were all ex parte and inadmissible. Besides, if a witness could not be heard, neither could affidavits nor any other evidence.
[5] III. Were the figures “1913” written by the testatrix?
This is a question to be determined by a preponderance of the evidence, and by the will itself as it appears to us.
It is proven and admitted that the rest of the date, and the body of the will, and the signature, are all in the handwriting of the testatrix. Therefore it is easy to presume, and without much corroborating evidence, that the date also is in the handwriting of the testatrix.
Two witnesses for plaintiffs testify that the figures “1913” are in her handwriting, viz.: (1) Sam Serio, who was her tenant for 13 years, who saw her write his rent receipts and was acquainted with her1 handwriting; (2) Mrs. Caroline Levy, who was one of the witnesses to the probate of the will of 1909, who knew the deceased for 22 years, and who lived with her in her home on several occasions, and who had seen her write and sign her name and who knew her handwriting. Both witnesses are legatees under the will.
On the other hand, the defendants introduce two witnesses: (1) Charles A. O’Niell, judge of the district court for the parish of St. Mary since November, 1908, and judge of the Supreme Court of this State since April, 1914, a legatee under the wills of 1909 and 1913, and a defendant in this suit, testifies that the document is in the handwriting of deceased with the exception of this “1913” which, he has no doubt, was not written by her. He has known the deceased all his life, has been her lawyer since 1893, and even after his ascent to the bench was her advisor, and has often seen her write and knows her handwriting.
(2) Mrs. Carrie Kramer, also a legatee under the will of 1909 and a defendant in this suit, swears that the document ,is in the handwriting of the testatrix except the figures “1913,” which are not in her handwriting. She has lived with the deceased since 1908, and has seen her write often and is familiar with her handwriting.
The opinion of all these four witnesses would be entitled to more authority if they were testifying as to the “handwriting” of *72 the deceased; but it loses weight when applied to mere figures.
The solution of the question whether the testatrix wrote the figures “1913” would present more difficulties were the testimony of these four witnesses the only evidence in the case. But the testimony of plaintiffs’ two witnesses is corroborated by the will, by surrounding circumstances, and by the expert, E. A. O’Sullivan. He testifies, without hesitation, that the figures “1913” were written by the testatrix. His testimony exhibits careful and skillful examinations and intelligent explanations that carry great conviction. His own testimony is corroborated by several other salient facts. The envelope in which the testament was found, and which is admitted to be in the handwriting of the deceased, has the following superscription: “My last will 1913 — 1913.”
The date of the will is “May 26 1913— 1913,” thus repeating the 1913. It is true that the figures “08” are written over the figures “13” in the first line; but the evidence is that these figures “08” were written by a strange hand, and we' believe it. The paper upon which the will is written was lined by Miss Marion in 1910 or afterwards. She recognized it. The figures “1913” are again found at the end of the will, again covered by the figures “Ó8,” and again in the second line after the figures 1913 in a sort of codicil. If the will of 1909 had been her last will, the testatrix would have added her codicil to that will and not to the will of 1913. Besides, the testatrix by her will of 1913 omits to mention her brother, to whom she had left the usufruct of all her property by the will of 1909, and who died in 1909. She says, concerning him: “In remembrance of Mr. Serio’s kindness to my brother in his illness,” etc. The evidence is that Mr. Serio became acquainted with the testatrix’s brother only in his last illness, which was in July, 1909. Again Judge O’Niell testifies that the testatrix never showed him the 1913 will, and never spoke to him about it, and that he heard of it • only after the death of the testatrix. We may explain that circumstance from the fact that “Mr.” O’Niell, who had been the attorney and advisor of the testatrix, became “Judge” O’Niell in 1908, and from that time the testatrix had fewer facilities for consulting him.
All these circumstances are a corroboration of the plaintiffs’ witnesses, and establish to our satisfaction that the figures 1913 were written by the testatrix.
We cannot adopt the views of the district judge in holding that the- figure on the right of the figure 2 in the date “May 26” is uncertain, and may be an “0” or a “6” or something else. There was no attack upon the will upon that ground. The only part of the date attacked in explicit terms was the year “1913.” Nevertheless the unanimous testimony is that the will was dated May “26,” and it appears so to us very evidently. Mrs, Carrie I-Cramer, a contestant of the will, testifies that the date “May 26” is written by the testatrix. Mrs. Caroline Levy, tendering the will, says that “May 26” is in the handwriting of the testatrix. E. A. O’Sullivan, the expert, gives it as his opinion that the figure is a “6.” The effect produced upon us is that the pen caught in the paper as the testatrix was closing the end of the figure “6.” The testatrix was over 80 years of age, her sight was weak, her orthography reveals a lack of school education; her chirography is not of the best, and evidences the hesitation, trembling, and nervous effects of age. While the “6” is not perfect, there is no suggestion, and certainly no testimony, that it is not a “6,” or that it is, or that it resembles, any other numeral. As this court said in Succession of Stewart, 51 La. Ann. 1559, 26 South. 460, 462:
“No one has assumed to say, as a witness, that it was not 1896, although the figure ‘6’ is not clearly written.”
*74 In that case the court said the question of “surcharge” or “writing over” was a question of fact.
[6] IV. Does the testament of 1913 revoke in its entirety the one of 1909?
Article 1691 (1684) provides:
' “The revocation of testaments by the act of the testator is express or tacit, general or particular. It is express when the testator has formally declared in writing that he revokes his testament, or that he revokes such a legacy or a particular disposition. It is tacit when it results from some other disposition of the testator, or from some act which supposes a change of will. It is general when all the dispositions of a testament are revoked. It is particular when it falls on some of the dispositions only, without touching the rest.”
It does not follow that because a testator has made two wills, the first is revoked.
C. 0. 1693 (1686):
“Posterior testaments, which do not, in an express manner, revoke the prior ones, annul in the latter only such of the dispositions there contained as are incompatible with the new ones, or contrary to them, or entirely different.”
C. C. 1723 (1716):
“When a person has ordered two things, which are contradictory, that which is last written is presumed to be the will of the testator, in which he has persevered, and a derogation to what has before been written to .the contrary.”
There is no clause in the will of 1913 revoking, in an express manner, the will of 1909 or any of its provisions, or any previous will or legacy; if there is any revocation, it must therefore be tacit or resulting from some disposition in the will of 1913 incompatible with the will of 1909 supposing a change of will.
We find no general dispositions in the will of 1913 incompatible with the will of 1909; both make a series of particular legacies with the exception of the will of 1909, which donates “the remaining cash and property at the disposal of the Archbishop for charitable purposes.” Some of these particular legacies are not very clear to one not familiar with the properties of the deceased. Of course, if any legacy contained in the will of 1909 is contrary to, or incompatible, or irreconcilable with, those contained in the will of 1913, the legdcies contained in the will of 1909 are to that extent revoked.
“When posterior testaments do not expressly revoke prior ones, they must 'all be executed, unless the last tacitly revoke the first.” Succession of Mercer, 28 La. Ann. 564.
“It is true that when the testator leaves two wills, the clauses of the first which are contrary to or incompatible with those of the last are considered as having been revoked; and, for the purpose of ascertaining any such changes of intention, the two are to be considered as distinct, and as having been executed at different dates. But when the intentions of the testator have been ascertained by setting aside these clauses, which, under the application of this rule are to be annulled, the remaining dispositions are to be considered as forming parts of one will, which it becomes the duty of the executors to execute as such.” Succession of Fisk, 3 La. Ann. 705, 706.
“Where a posterior testament contains no disposition from which a change of intention in the testator, with regard to a legacy in a prior will, can be presumed, the legacy will not be revoked.” City v. Fisk, 2 La. Ann. 78; Lyon v. Fisk, 1 La. Ann. 444, 455.
“Two wills made at different times may stand together in all the parts in which they are not inconsistent. But where they conflict the provisions in the last one will prevail.” Tournoir v. Tournoir, 12 La. 19.
“Where a prior will gave certain specific (particular) legacies, and the subsequent one made the testamentary executor universal legatee, without any mention, of particular legacies and without any revocatory clause, held, that the subsequent will did not revoke the particular legacies in the first, by omitting them and instituting a universal legatee; but that the executor is bound to pay them.” Sarce v. Dunoyer, 11 La. 220.
See, also, Succession of Bobb, 42 La. Ann. 40, 7 South. 60; O. N. 1036-2 Dalloz, Codes Annotés Nos. 41, 42, p. 751, Code Nap. 1036, p. 754, No. 114 et seq., and numerous French commentators quoted.
[7] Y. In both wills the testatrix appoints the pastor or priest of the Church of Franklin executor, without naming him. We believe she intended to appoint the person who would fill the position of priest at the time his services as executor would be required. If she intended to appoint the priest who officiated at the time she made her two wills she would have said who are “now” the priest *76 at Franklin, or she would have named them, as she was well acquainted with them both. “A donation mortis causa,” says O. O. 1469 (1455), “is an act to take effect, when the donor shall no longer exist.” When, therefore, the testator named an executor, she looked to the future. When her testament took effect J. J. Rousseau was the priest at Franklin.
The article of the Civil Code, 1721 (1714), provides that a disposition couched in the future tense refers to the time of the death of the testator. Certainly the appointment of an executor looks to the future, to the very time of the death of the testator. A will speaks as of the death of the testator. Succession of Marks, 35 La. Ann. 1054; Thomas v. Blair, 111 La. 678, 684, 35 South. 811; 40 Cyc. 1424. It is just as if the testatrix had said that she appointed for executor of her will the person who would be the priest at Franklin at the time of her death.,, The trust was conferred upon the officer, and not upon the individual. McDonald v. Shaw, 81 Ark. 235, 98 S. W. 952; Appeal of Seibert (Pa.) 6 Atl. 105.
In Succession of Allen, 48 La. Ann. 1046, 1047, 20 South. 193, 197 [55 Am. St. Rep. 295], this court said:
“The will speaks from the death of the testator, that being the point of time at which it becomes operative (21 Conn. 550, 516), unless the language used, such as the word ‘now,’ or a verb in the present tense which requires it to be taken at the time it is used. 1 Jarman, Wills, 318. But it will receive the former interpretation if it can reasonably be made to bear it. Cox, Ch. 384.”
In the Succession of Burnside, 35 La. Ann. 708, 717, a legacy of all the testator’s property, though couched in the present tense, was interpreted to mean all the property the testator owned at the date of his will, and would own in the future at the time of his death.
In Succession of Marks, 35 La. Ann. 1054, this court said:
“A will speaks as of the death of the testator, and conveys all the property owned by him at that time, unless a contrary intention manifestly appears.”
Affirmed in Succession of Blakemore, 43 La. Ann. 846, 850, 9 South. 496.
An executor has been compared to the mandatory or agent of the deceased at death. The will reads:
“I bequeath to the priest of this church the sum of two thousand dollars and I appoint him executor of this will without bond.”
“For the care of our lot in the cemetery and for having masses said for the family and the most neglected souls in purgatory one thousand dollars.”
This money legacy was doubtless intended by the testatrix as a remuneration for the services to be rendered by the executor, for taking care of the tomb, and for saying masses for the family. If that supposition is correct, why should the testatrix appoint as executor, or leave a legacy to, a priest in of-1 fice at the date of her will, who might not be so at her death, or who might not be the executor of her will, and thus never be her mandatory, or agent after death? Her legacies were for pious purposes, and only the priest of the parish at the time of her death could be her mandatory to carry out her wishes. The testatrix appointed as her executor “the priest of the parish.” 1-Iow could Father Trainor pretend to be the man intended by the testatrix, since he was not the priest of the parish at her death?
For these reasons, we are of the opinion that Rev. J. J. Rousseau is entitled to the appointment of testamentary executor.
It is therefore ordered, adjudged, and decreed that the judgment appealed from be affirmed in so far as it revokes and sets aside the decree appointing Rev. J. H. Trainor as executor herein, and in so far as it confirms Rev. J. J. Rousseau as such executor and orders letters to issue to him as such on his complying with the requirements of the law.
It is further ordered that said judg *78 ment be reversed, avoided, and annulled in so far as it refuses to probate tbe will of tbe deceased dated May 26, 1918, and it is now ordered that the document presented by the plaintiffs herein, and dated May 26, 1913, be decreed to be the olographic last will and testament of the deceased, Frances Caroline Lefort, and to have been duly probated according to law, and that it be registered and executed according to law, without prejudice to the will of 1909, unless the dispositions contained in the will of 1909 are contrary to, irreconcilable and incompatible with, those contained in the will of 1913.
It is further ordered that the succession pay all costs.
LAND and PROVOSTX, JJ., dissent.
See dissenting opinion of PROVOSTS', J., 71 South. 223.